SYLVIA TORRES-GUILLÉN (SBN 164835)
  storres-guillen@aclusocal.org
HANNAH COMSTOCK (SBN 311680)
  hcomstock@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN CALIFORNIA, INC.
1313 W. 8th Street
Los Angeles, CA 90017
Telephone:  (213) 977-5220
Facsimile:   (213) 977-5299

Attorneys for Plaintiffs

*Additional counsel on following page*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# EASTERN DIVISION

| | |
|---|---|
| SIGMA BETA XI, INC.; ANDREW M., by and through his next friend DENISE M.; JACOB T., by and through his next friend HEATHER T., on behalf of himself and all others similarly situated; J.F., by and through her next friend CINDY MCCONNELL, on behalf of herself and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF RIVERSIDE; MARK HAKE, Chief of the Riverside County Probation Department, in his official capacity; BRYCE HULSTROM, Chief Deputy of the Riverside County Probation Department, in his official capacity,<br><br>Defendants. | CASE NO. 5:18-cv-01399<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF, NOMINAL DAMAGES**<br><br>(Violation of: First, Fourth, and Fourteenth Amendments of the U.S. Constitution; Article 1 §§ 2a, 3, 7, and 13 of the California Constitution; California Government Code § 11135) |

CHRISTINE P. SUN (SBN 218701)
  csun@aclunc.org
LINNEA L. NELSON (SBN 278960)
  lnelson@aclunc.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF
NORTHERN CALIFORNIA, INC.
39 Drumm St.
San Francisco, CA 94111
Telephone:  (415) 621-2493

SARAH HINGER*
  shinger@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
Telephone:  (212) 519-7882
*Pro Hac Vice Motion to be submitted

DAVID LOY (SBN 229235)
  davidloy@aclusandiego.org
MELISSA DELEON (SBN 272792)
  mdeleon@aclusandiego.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION OF SAN
DIEGO AND IMPERIAL COUNTIES
P.O. Box 87131
San Diego, CA 92138-7131
Telephone: (619) 398-4489
Facsimile:  (619) 232-0036

SHEPPARD, MULLIN, RICHTER &
HAMPTON LLP
A Limited Liability Partnership
Including Professional Corporations
MOE KESHAVARZI (SBN 223759)
mkeshavarzi@sheppardmullin.com
ANDREA N. FEATHERS (SBN 287188)
  afeathers@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:    (213) 620-1780
Facsimile:    (213) 620-1398

MICHAEL HARRIS (SBN 118234)
  mharris@youthlaw.org
NATIONAL CENTER FOR
YOUTH LAW
405 14th Street, 15th Floor
Oakland, CA 94612
Telephone:    (510) 835-8098
Facsimile:    (410) 835-8099

VICTOR LEUNG (SBN 268590)
  vleung@aclusocal.org
ALEXIS PIAZZA (SBN 316047)
  apiazza@aclusocal.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF SOUTHERN
CALIFORNIA, INC.
1313 W. 8th Street
Los Angeles, CA 90017
Telephone:  (213) 977-5219
Facsimile:  (213) 977-5299

Attorneys for Plaintiffs

# I. **PRELIMINARY STATEMENT**

1.      In Riverside County, California, school administrators have implemented an astonishingly punitive and ineffective law enforcement program. It places children under probation supervision for normal, childish behavior. By doing so, it systematically undermines our collective responsibility to give every child—regardless of race or ethnicity—the chance to stay in school and on track to succeed. Rather than supporting students to keep them engaged in school through mentorship and counseling, the County sweeps children into six-month terms of probation through its "Youth Accountability Team" ("YAT") Program, for being "defiant," "easily persuaded by peers," or tardy to school; using "inappropriate language"; and behavior associated with grieving over the death of a parent. Every day that this probation program remains in place, we jeopardize the potential of hundreds of young people who are diverted away from educational success and toward the criminal justice system.

2.      Riverside County, through the Probation office and its allies, cannot be permitted to target, ensnare, and discriminate against children in our schools in Riverside County, by stripping them of their constitutional rights and treating them like criminals. This needs to stop. Riverside County cannot be permitted to continue to manipulate and financially benefit from this program on the backs of Riverside's children, especially Black and Latinx children.

3.      Riverside County, through the collective efforts of its law enforcement agencies, has subverted the purpose of the law under which the YAT program was created by quietly sweeping tens of thousands of children and adolescents into punitive probation supervision for the "offense" of childish behavior. These children are put on contracts that impose a laundry list of onerous conditions that set young people up to fail and also cause them to fall deeper into the criminal system. As former Senior Probation Officer Debbie Waddell stated when describing the YAT

Program, "what we're really doing is using this program to get them into the system by fingerprinting and photographing them. We can search their homes any time we want and work to obtain evidence against them so that when we can get 'em, we can really get 'em!" Former Riverside County Deputy District Attorney Anthony Villalobos followed these statements, explaining, "We can do all kinds of surveillance, including wire taps on phones, without having to get permission from a judge."[1]

4.      Many children have fallen prey and suffered the constitutional violations and abuse that prevails in Riverside County's YAT program. Plaintiffs Andrew M., Jacob T., and J.F., are students in Riverside County who are or have been placed on probation through the Riverside County YAT program for alleged school misconduct. Plaintiff Sigma Beta Xi is a non-profit organization providing mentoring services to children of color in Riverside County. Numerous Sigma Beta Xi mentees are or have been placed on YAT probation. They are among the over four hundred children placed on YAT probation each year. Between 2005 and 2016, 12,971 children across Riverside County have been placed on YAT probation, including 3,219 for non-criminal offenses. Children as young as first graders have been referred to YAT.

5.      Riverside County's Probation Department operates YAT probation as an additional and more punitive and invasive layer of school discipline. Defendants refer to YAT as a diversion program, in which "informal" probation purportedly allows children to avoid the harsh penalties of being tried in court. Avoiding deeper contact with the juvenile justice system would be an appropriate objective for a diversion program. A substantial body of research shows that increased contact with the juvenile justice system is counterproductive and harmful to child development

---

[1]    David L. Roberts, <u>Psyche-Soul-ology, An Inspirational Approach to Appreciating and Understanding Troubled Kids</u> 67–69 (2007).

and rehabilitation. In practice, however, the "informal" nature of YAT probation leaves children worse off. YAT probation keeps the harmful contacts with the criminal system while eschewing procedural protections. Placing a child on YAT probation includes none of the safeguards of judicial process, such as access to appointed counsel, adequate notice of charges or the underlying facts, or any kind of impartial decision maker. At the same time, it imposes consequences that are often more severe than those that would be imposed by a court.

6.     Rather than divert children, YAT draws more children into the criminal system. Probation places YAT officers on site in public schools across Riverside County and actively solicits referrals for things that would otherwise be addressed routinely by the school and better resolved through supportive interventions. Children are referred to Probation for alleged "behavior issues," such as uttering profanity, being easily influenced by peers, being late to class, and being disrespectful. Defendants make use of an antiquated and unconstitutionally vague law intended to regulate "incorrigible" children, Cal. Welf. & Inst. Code § 601, to place children on terms of probation for these and other mundane school infractions. In the absence of clear standards, enforcement of this law is both arbitrary and discriminatory. Black and Latinx children in Riverside County are disproportionately referred to probation for incorrigibility. One Black child was placed on YAT probation for "pulling the race card."

7.     Placing children on probation under these circumstances is not only counter-productive; it also violates their constitutional rights. Children subject to YAT probation are required to comply with a long list of conditions, including curfews and reporting absences to YAT, that set them up to fail. They are routinely required to submit to drug testing and sign waivers permitting the search of their home and persons in violation of their Fourth Amendment rights. They are also required to comply with broad requirements not to associate with anyone not

approved by Probation, infringing their First Amendment rights. Heavy-handed supervision conditions like these have been shown to be ineffective and even harmful.

8.       Compounding the problems with YAT, Defendants place children on YAT probation contracts through an entirely informal process that is void of basic safeguards of procedural due process. Children ostensibly agree to submit to conditions of probation that interfere with fundamental liberty under coercive circumstances that preclude knowing, voluntary, or intelligent consent. Families also ostensibly agree to comply under the same coercive conditions. The Defendants fail to provide children and families with any formal notice of what children are charged with or the underlying allegations, their legal rights, or the juvenile court process. Instead, referral to YAT is communicated through a brief, informal, and inadequate conversation by phone or in person at school, in which Defendants sometimes blatantly misrepresent the nature of the YAT program and the consequences of not acquiescing to YAT probation.

9.       Knowing little except that they purportedly face charges in the criminal system, children and their families enter a meeting with members of the YAT team, which include probation officers and law enforcement, often armed, and can include members of the prosecutor's office, without the information needed to refute the allegations or otherwise advocate for themselves. These meetings are held in YAT offices or local police stations. No semblance of an impartial decision maker is present. Children are not informed of their rights, including the right to remain silent or to speak with a lawyer. Instead they are led to believe that if they do not agree to enter the YAT program, they may be referred to the District Attorney's office, even when they are not accused of a criminal offense. Without their own advocate, and facing their first involvement with the criminal system, children, as well as their parents, are pressed to agree to a YAT probation contract. In these circumstances,

1    children who often stand accused of as little as violating school rules are not able to

2    make voluntary, knowing, and intelligent decisions to accept YAT probation's

3    onerous conditions.

4          10.    Beyond these constitutional violations, the injuries to children and their

5    families arising from YAT probation far outlive the child's six-month probation

6    contract. Through YAT, law enforcement officials compile and exchange a vast

7    amount of information about a child, including their school records, which may

8    include special education records, counseling records, details about their family

9    history including contact with the justice system, substance abuse, domestic

10   violence, and history with other social service agencies, and individual family

11   member information. This includes information that law enforcement would have

12   been prohibited from obtaining under the Fourth Amendment. Defendants retain and

13   use this vast quantity of sensitive information even after the successful completion

14   of a YAT contract. Indeed, even though Defendants claim that the YAT program is

15   informal and intended to keep children out of the juvenile justice system,

16   information obtained about a child through YAT may be used against them in future

17   juvenile court proceedings. Once a child has been involved with YAT, no matter the

18   basis, he or she is statutorily ineligible for any other diversion opportunity in the

19   future.

20         11.    Plaintiffs Jacob T. and J.F. bring this action on behalf of themselves

21   and on behalf of a class of similarly situated children in Riverside County who have

22   been placed on YAT probation or who have been referred to YAT but not yet placed

23   on YAT probation. Defendants' operation of YAT infringes Plaintiffs' constitutional

24   and civil rights under California and federal law, including their rights under the

25   First, Fourth, and Fourteenth Amendments of the U.S. Constitution, the California

26   Constitution Article 1, sections 2a, 3, 7, and 13, and California Government Code

27   § 11135. Plaintiffs seek declaratory and injunctive relief from the ongoing injury to

28

their rights. Plaintiff Sigma Beta Xi brings this action as an organization whose mission has been frustrated by the operation of YAT. Plaintiff Andrew M. brings this action on behalf of himself seeking nominal damages because Defendants violated his constitutional rights by placing him on YAT probation and injunctive relief against Defendants because they retained records collected or created in relation to Andrew's placement on YAT probation.

## II. **PARTIES**

12.     Plaintiff Andrew M. is a fifteen-year-old Black male who resides in Moreno Valley, in Riverside County, California, and attends Valley View High School in the Moreno Valley Unified School District. He appears in this action by and through his mother and next friend, Denise M., and will submit a motion to appear under a fictitious name. Denise M. resides with Andrew M. in Moreno Valley, California, and is a competent and reasonable person who is dedicated to acting in Andrew M.'s best interests and fairly and adequately representing him in this litigation. Denise M. is willing to act as Andrew M.'s next friend in this litigation and is sufficiently familiar with the facts of his situation.

13.     Plaintiff Jacob T. is a sixteen-year-old white male who resides in Moreno Valley, in Riverside County, California, and attends the Riverside County Education Academy, a military academy associated with the Riverside County Office of Education. He appears in this action by and through his mother and next friend, Heather T., and will submit a motion to appear under a fictitious name. Heather T. resides with Jacob in Moreno Valley, California, and is a competent and reasonable person who is dedicated to acting in Jacob T.'s best interests and fairly and adequately representing him in this litigation. Heather T. is willing to act as Jacob T.'s next friend in this litigation and is sufficiently familiar with the facts of his situation.

14.    Plaintiff J.F. is a seventeen-year-old Black female who resides in Moreno Valley, in Riverside County, California and attends Val Verde High School, a continuation school in the Val Verde Unified School District. She previously attended Rancho Verde High School. She appears in this action by and through her grandmother and next friend, Cindy McConnell. Cindy McConnell resides with J.F. in Moreno Valley, California, and is a competent and reasonable person who is dedicated to acting in J.F.'s best interests. Cindy McConnell is willing to act as J.F.'s next friend in this litigation and is sufficiently familiar with the facts of her situation.

15.    Plaintiff Sigma Beta Xi, Inc. ("Sigma Beta Xi"), is a non-profit community-based organization located in Moreno Valley, California, that provides mentoring and leadership development services to approximately 220 children of color in Riverside County who are struggling in school. These mentoring services further  Sigma Beta Xi's mission "to establish strong families and communities by building an organization of diverse men and women who will exemplify leadership and professionalism based upon the principles of brotherhood, sisterhood, excellence, endurance, wisdom, service, and unity."

16.    Defendant Riverside County ("County") is a municipality within the State of California, with capacity to sue and be sued. Riverside County Board of Supervisors ("Board of Supervisors") is the governing body of the County. The Board of Supervisors is responsible for supervising all county officers, including all agencies and departments responsible for implementing and administering the Youth Accountability Program. Cal. Gov't Code § 2530. The Riverside County Juvenile Justice Coordinating Council ("Council"), led by the County Chief Probation Officer, is responsible for developing a "comprehensive multiagency juvenile justice plan" ("JJCPA Plan"), pursuant to California Government Code § 30061, through which it developed and continues to reauthorize and expand the

operation of the Youth Accountability Program. The Board of Supervisors is responsible for approving the Council's plan each year.

17.    Defendant Mark Hake, sued in his official capacity, is the Chief Probation Officer for the Riverside County Department of Probation. Defendant Hake is also the Chair of the Riverside County Juvenile Justice Coordinating Council.

18.    Defendant Bryce Hulstrom, sued in his official capacity, is the Deputy Chief Probation Officer for the Riverside County Department of Probation.

19.    Defendants are the officials responsible for operating the Youth Accountability Program, enforcing California Welfare & Institutions Code sections 601 and 654, and implementing the policies, practices, and customs challenged in this Complaint.

20.    Defendants, acting under color of state law, performed, participated in, aided and/or abetted the acts and omissions averred herein, proximately caused the damages averred below, and are liable to Plaintiffs for the damages, injunctive, and declaratory relief sought herein.

### III.  **JURISDICTION AND VENUE**

21.    Plaintiffs bring this action pursuant to 42 U.S.C. § 1983 for violations of rights secured under the First, Fourth, and Fourteenth Amendments to the United States Constitution. Plaintiffs also bring state claims under Article I, sections 2a, 3, 7, and 13 of the California Constitution, and California Government Code section 11135.

22.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution of the United States. Additionally, pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over Plaintiffs' state law claims made under the California

Constitution and the California Government Code because such claims stem from the same case or controversy arising from a common nucleus of operative fact.

23.    This Court has personal jurisdiction over Defendants because they operate within this district, and because Defendants' acts and omissions took place within this district.

24.    Venue is proper in this federal district pursuant to 28 U.S.C. § 1391(b). Defendants are located in the Central District of California and all of the acts and/or omissions complained of herein have occurred or will occur in this district. Additionally, Plaintiffs reside in this district.

## IV.  GENERAL ALLEGATIONS

A.    Adolescent Development and Ineffective and Effective Interventions Across the Education and Juvenile Justice Systems

25.    In recent decades, emerging research on adolescent development has prompted numerous reforms in juvenile justice and school-based approaches to children's behavior. Research documents the process of adolescent development as marked by important changes in brain systems involving cognitive and behavioral control and socioemotional functioning.[2] As the Supreme Court recognized, the scientific research confirms "what any parent knows," that children "are more vulnerable or susceptible to outside pressures," and, in in the context of interaction with law enforcement, can be easily "overawe[d] and overwhelm[ed]." *J.D.B. v. North Carolina*, 564 U.S. 261, 272–73 (2011) (internal alterations, quotations, and citations omitted). Through adolescent development, children are unlikely to be

---

[2]    National Research Council, *Reforming Juvenile Justice: A Developmental Approach* 2 (Richard J. Bonnie et al. eds. 2013), https://doi.org/10.17226/14685.

1  motivated by sanctions and deterrent strategies, whereas individualized supports and

2  positive incentives are more likely to help children to develop positive life skills.[3]

3        26.    Recognizing these facets of adolescent development has important

4  implications for responding to children's behaviors.[4] Across education and juvenile

5  justice systems, it was once thought that harsher responses to children's misconduct

6  were necessary to correct wayward children before they became hardened criminals

7  and to prevent a wave of "super predators."[5] Today, researchers and policy makers

8  recognize not only that this fear was misplaced, but also that these zero-tolerance

9  approaches actually fail to prevent future recidivism or disciplinary issues and can

10  have substantial negative impacts for children.[6] As the Government Accountability

11  Office observes: "Students who face certain types of discipline in school may be

12  affected in profound ways that influence their lives as adults. . . . Research has

13  shown that students who are suspended from school lose important instructional

14  time, are less likely to graduate on time, and are more likely to repeat a grade, drop

15  out of school, and become involved in the juvenile justice system. The effects of

16  certain discipline events, such as dropping out, can linger throughout an individual's

17  lifetime and lead to individual and societal costs."[7] Recognizing this, many states

18

19  _____

20  [3]  Richard A. Mendel, Annie E. Casey Foundation, *Transforming Juvenile Probation: A Vision for Getting It Right* 10 (2018),
21  http://www.aecf.org/resources/transforming-juvenile-probation/.

22  [4]  National Research Council, *supra* note 2, at 2 (concluding that "[m]uch adolescent involvement in illegal activity is an extension of the kind of risk
23  taking that is part of the developmental process of identity formation, and most
24  adolescents mature out of these tendencies").

25  [5]  *Id.* at 38–41.

26  [6]  *See, e.g.*, *id.* at 43–47.

27  [7]  U.S. Government Accountability Office, *K-12 Education: Discipline Disparities for Black Students, Boys, and Students with Disabilities* 1 (March 2018),
28  https://www.gao.gov/assets/700/690828.pdf.

and school districts are moving to reduce reliance on suspensions, expulsions, and referrals to the justice system, relying more on supportive interventions and changes to school culture with demonstrated positive effects.[8]

27.    Within the juvenile justice system, research also demonstrates the need to reassess prior approaches. Many interventions previously adopted in an effort to get tough on juveniles were not only misguided but ineffective and harmful to children. "Research shows that juvenile justice systems can do more harm than good by actively intervening with children who are low risk of reoffending."[9] Summarizing the research, the Counsel of State Governments ("CSG") identifies a number of "generally ineffective" juvenile justice programs, including: overcrowded detention facilities, boot camps, curfews, and "scared straight and other 'shock therapy' programs."[10] As with ineffective responses in the education system, these forms of intervention focus on control, discipline, fear and surveillance. Instead, CSG highlights successful approaches including the use of cognitive behavioral therapy, engaging families and supportive mentors, focusing resources on promoting positive behavioral change, and using developmentally informed means of holding

---

[8]    *See* National Center for Education Evaluation and Regional Assistance, *What Works Clearing House: Behavior*, https://ies.ed.gov/ncee/wwc/FWW/Results?filters=,Behavior (last visited June 25, 2018).

[9]    Elizabeth Siegle, et al., Counsel of State Governments Justice Center, *Core Principles for Reducing Recidivism and Improving Other Outcomes for Youth in the Juvenile Justice System* 9 (2014), https://csgjusticecenter.org/wp-content/uploads/2014/07/Core-Principles-for-Reducing-Recidivism-and-Improving-Other-Outcomes-for-Youth-in-the-Juvenile-Justice-System.pdf.

[10]    *Id.* at 17 (citing Mark Lipsey, et al., Improving the Effectiveness of Juvenile Justice Programs: A New Perspective on Evidence-Based Practice (2010), https://cjjr.georgetown.edu/wp-content/uploads/2015/03/ImprovingEffectiveness_December2010.pdf).

children accountable.[11] Recognizing the potential to do more harm than good, many states and localities are adopting reforms to limit children's contact with the system.

28.    Juvenile probation programs have not received the same level of attention as other facets of juvenile and criminal justice reform. However, as the Annie E. Casey Foundation recently reported, "the research indicates that surveillance-oriented probation is not an effective strategy for reversing delinquent behavior, with insignificant effects on reoffending and especially poor results with youth at low risk of re-arrest."[12] Moreover, as Casey Foundation researchers summarize:

> Studies dating back decades have found that many or most diversion program participants are accused of minor misbehaviors, which would be handled more appropriately with a warning—despite a large body of research showing that this "net-widening" dynamic of diversion programs sometimes does more harm than good.[13]

Instead, students accused of school misbehavior or accused of low-level offenses should be referred to appropriate service providers.[14] Probation officers should have no role in overseeing diverted children and rather should carry smaller caseloads of children convicted of crimes, and focus on positive behavior change for these children.[15]

29.    The use of counterproductive and harmful interventions has greater consequence for children of color, who are more likely to be subject to punitive school discipline and overrepresented across the juvenile justice system. Research evidences substantial racial disparities in school discipline that are "not explained by

---

[11]  Siegle et al., *supra* note 9, at 18, 36–40.

[12]  Mendel, *supra* note 3, at 7.

[13]  *Id.* at 13.

[14]  *Id.* at 27.

[15]  *Id.* at 31.

more serious or more frequent misbehavior by children of color."[16] Disparities in school discipline are most pronounced for offenses like "defiance" or "disrespect," where school staff must rely on their own subjective interpretations to enforce school rules.[17] Racial disparities carry over to and persist within the juvenile justice system. For example, one study of the narrative reports of probation officers found that "probation officers describe black and white youths differently, referring to negative personality traits for black youths and more to negative environmental influences for whites," and that "black youths were judged to have a higher risk of reoffending."[18] Similarly, white youth are more likely to use marijuana, but Black youth are more likely to be arrested for marijuana possession.[19] To address racial disparities in the juvenile criminal system, CSG recommends practices that "promote objective decision making," such as improving the quality of and access to defense attorneys, training on recognizing and overcoming explicit and implicit bias and becoming more culturally competent and continued oversight of the system.[20]

---

[16]  Siegle et al., *supra* note 9, at 4 & n.7.

[17]  Russell J. Skiba et al., *Race is Not Neutral: A National Investigation of African American and Latino Disproportionality in School Discipline*, 40 School Psych. Rev. 1, 101 (2011), http://www.indiana.edu/~equity/docs/Skiba%20et%20al%20Race%20is%20Not%20Neutral%202011.pdf.

[18]  George S. Bridges & Sarah Steen, Racial disparities in official assessments of juvenile offenders: Attributional stereotypes as mediating mechanisms, 63 Am. Soc. Rev., 554, 561 (1998).

[19]  Cylan Matthews, *The Black/White Marijuana Arrest Gap, In Nine Charts*, WASHINGTON POST (June 4, 2013), https://www.washingtonpost.com/news/wonk/wp/2013/06/04/the-blackwhite-marijuana-arrest-gap-in-nine-charts/?utm_term=.1efda39c3684.

[20]  Siegle et al., *supra* note 9, at 41.

B.        History and Structure of the Youth Accountability Team Program

30.      The California Juvenile Justice Crime Prevention Act ("JJCPA") was passed in 2000 to provide funding for programs "demonstrated to be effective in reducing delinquency . . . including prevention, intervention, suppression, and incapacitation."[21] When the JJCPA was passed, California, like much of the country, was focused on increasing criminal penalties and expanding law enforcement surveillance and control over children. Today, however, state and local actors recognize that their "tough on crime" approach left California hemorrhaging money on ineffective and counterproductive programs while ignoring the needs and characteristics unique to children and failing to provide them the tools, resources, and education they needed to succeed. The legislature has since passed a number of bills to reform the juvenile justice system to promote rehabilitation and protect children's constitutional rights.[22]

31.      The JJCPA, which requires county programs to be "demonstrated to be effective" and include a "continuum of responses," Cal. Gov't Code § 30061(b)(4)(A)(iii), (b)(4)(B)(i), provides sufficient flexibility to permit local governments to similarly reform their juvenile justice practices in light of developing research and evolving best practices and to better protect juvenile rights. However, Riverside County continues to use millions of dollars in JJCPA funds to operate a program employing tactics shown to be counterproductive and even harmful to children.

---

[21]  The Juvenile Justice Crime Prevention Act, Cal. Gov't Code, §30061(b)(4)(B)(i) (2000). The Act was originally named the Schiff-Cardena Crime Prevention Act of 2000. *See* http://www.leginfo.ca.gov/pub/99-00/bill/asm/ab_1901-1950/ab_1913_bill_20000908_chaptered.html.

[22]  *See California Legislature Approves Juvenile Justice Bills to Update Miranda Rights, Allow Parole for Youthful Offenders*, CAL. STATE SENATE (Sept. 15, 2017), http://sd33.senate.ca.gov/news/2017-09-15-california-legislature-approves-juvenile-justice-bills-update-miranda-rights-allow.

32.     In 2001, the County adopted a Juvenile Justice Plan that included the creation of the "Youth Accountability Team" Program run by the Department of Probation. The Youth Accountability Team Program has operated consistently since 2001 as the most substantial component of the County JJCPA Plan. The Department of Probation runs YAT probation. Law enforcement agencies across the county as well as the District Attorney's Office are also parties to a joint MOU setting out their roles in operating YAT.

33.     YAT purports to operate pursuant to California Welfare & Institutions Code section  654, which provides:

> In any case in which a probation officer, after [an investigation] concludes that a minor is within the jurisdiction of the juvenile court or will probably soon be within that jurisdiction, the probation officer may, in lieu of filing a petition to declare a minor a dependent child of the court or a minor or a ward of the court under Section 601 . . . and with consent of the minor and the minor's parent or guardian, delineate specific programs of supervision for the minor, for not to exceed six months . . . .

34.     Section 654 permits the creation of a program of diversion from formal adjudication and the presumably more serious consequences applicable therein. A child is only eligible for a program of supervision under Section 654 for a first-time offense, and is ineligible if she has already participated in a program under Section 654. Cal. Welf. & Inst. Code § 654.3. Children accused of certain offenses are presumed ineligible. *Id.*

35.     YAT targets children "ages 12-17 years old who are purportedly displaying *pre-delinquent* and delinquent behavior" (emphasis added). This effectively brings more children, not fewer, into the juvenile justice system, relying on probation supervision to take the place of school-based interventions.

36.     YAT officers aggressively solicit referrals for children considered to be "at risk," which YAT broadly defines to include "family conflict, mental health, school adjustment, or gang involvement." As one school district explained in

responding to a public records request, "YAT . . . look[s] for students who have been involved in the first stages of school discipline, might have poor or failing grades, and are showing initial signs of moving toward more at-risk behaviors." These children, who have not committed any criminal offense, are then placed on a regimented probation contract.

37.    As Defendants have described in presenting the YAT probation program to school districts, YAT probation contracts "contain terms and conditions similar to those issued by the Courts to juveniles placed on formal probation," such as curfew, weekly check-ins, home searches, and community service, and last for six months. "Cases may be terminated and forwarded to the YAT District Attorney at any time for possible adjudication in Juvenile Court due to non-compliance or violations," and "[w]arnings, community restriction, and increased or additional terms may be added to an existing YAT contract at any time for non-compliance." These terms mean that a school rule violation can be viewed by Defendants as cause to prosecute a child. The YAT probation contract likewise ominously states that "any violation of the terms and conditions may be grounds for referring the matter to the District Attorney's Office for prosecution," even when the underlying alleged conduct is not criminal.

38.    Each year, most of the County's JJCPA funds are allocated to YAT. For fiscal year 2017–2018, the County proposed budget allocated $10,627,404 to YAT, ninety-seven percent of the County's JJCPA budget. The vast majority of these funds are allocated to pay the salaries of Probation officers, law enforcement, and District Attorneys' office employees assigned to work with the YAT program. Over a span of eight years, between fiscal years 2009–2010 and 2016–2017, the average percentage of JJCPA funds allocated to salaries and benefits was 82.64%, while community-based organizations received an average of 8.10% of funds.

1  According to the terms of the MOU's, school districts also donate office space and

2  supplies, like telephones, to YAT officers operating within their schools.

3    39.    YAT is currently established in seventeen school districts in Riverside

4  County. In 2015, the most recent year of complete data available to Plaintiffs, 1,505

5  children were referred to YAT and 915 were placed on probation. Defendants have

6  actively sought to expand the number of young people placed on YAT probation,

7  including by expanding their presence from high schools into middle schools in

8  Riverside County. In 2016, the Department of Probation itself reported that it had

9  launched an effort to increase referrals, "resulting in a 189% increase in the referrals

10  received monthly."

11  C.    Defendants Use an Unconstitutionally Vague Law and Vague Referral

12        Criteria to Funnel Children into YAT Probation for Common School

13        Disobedience and Symptoms of Trauma

14    40.    Through YAT, Defendants actively solicit and facilitate referrals from

15  schools, including for non-criminal behaviors, and rely on the vague terms of an

16  antiquated incorrigibility law and an informal process to place children on terms of

17  probation supervision that infringe their constitutional rights, frequently exceed the

18  maximum penalties contemplated by the legislature, and come with other harmful

19  direct consequences.

20    41.    Defendants frequently place children under onerous probation

21  supervision not on the basis of the commission of any criminal offense, but merely

22  adolescent misbehavior. A review of the first five years of YAT's operation found

23  that at least seventy-six percent of referrals to YAT were made for status offenses—

24  things that are only offenses because of a person's age—and recognized that "[i]n

25  the past, the [Juvenile Justice] system or the community did not actively engage

26  these youth."

27

28

42.    Defendants hide behind the vague terms of California Welfare & Institutions Code section 601 ("Section 601") to inveigle children as young as eleven years old into YAT and the criminal system for a wide range of typical school misbehavior and even for reasons that have nothing to do with accusations of misconduct. For example, some children have been referred to YAT because they have identifiable mental health needs, are exhibiting symptoms of trauma, or are simply showing signs of adolescent immaturity.

43.    Section 601 makes it an offense for a juvenile to "persistent[ly] or habitual[ly] refuse[] to obey the reasonable and proper orders or directions of school authorities." This antiquated provision dates to the earliest codification of California law, and to a time when legislative drafters presumed the state's wide latitude to regulate the lives of juveniles, standing in the stead of their parents. The Supreme Court has since made clear that juveniles have constitutional rights, including the right to due process, which the state must respect. *See In re Gault*, 387 U.S. 1 (1967). The terms of Section 601 cannot, therefore, remain unchanged and open-ended.

44.    Section 601 provides no further definition of the term "persistently or habitually," leaving the average child or adult to guess at how many instances, or how long a period of disobedience, might trigger the law's invocation. Moreover, the law provides no further guidance in interpreting the term "reasonable and proper orders or directions." Instead, enforcement authority is delegated to school staff, meaning that a teacher can elevate a violation of school rules to a justice system referral on the basis of his or her subjective judgment. The vague terms of these laws invite arbitrary and discriminatory enforcement. The discretion to interpret these vague terms invites implicit and explicit bias in referrals and outcomes impermissibly based on the race and disability status of the child.

45.    Probation takes full advantage, assuming an unfettered grant of authority. It actively solicits and requires referrals to YAT from school staff pointing to the terms of an MOU they created. Probation encourages referrals for non-criminal, mundane childhood behavior, including: "failure/refusal to follow directives (actively or passively): at school (e.g. talking back to security guard) or at home (e.g. curfew, chores, telephone use)"; "general and repetitive disrespect toward family or school authority figures (incorrigible)"; and "anti-social behavior that disrupts classroom activity—talking during class, refusal to do work, prohibiting others from learning, walking out of class, talking back to the teacher, etc.—as reported by the teacher."

46.    A 2015 YAT Technical Report identifies possible "charges" for YAT referrals to include, *inter alia*, truancy, defiance/incorrigibility, and "mental issues." "Mental issues" is further defined in YAT's template entry assessment form to include "suicide attempts" and "treatment/problems." The standard referral form created by YAT includes similar though not entirely consistent "problem areas" and "mental health issues" that school staff or other referrers can select for Riverside County to then funnel children in crisis into the YAT program and the criminal system.

47.    Conflating childhood behavior with criminal conduct, Defendants fast-track and reroute children into criminal supervision who are processing deep grief or trauma, displaying signs of disability, or simply having an off day focusing and following directions. Indeed, children have been referred to YAT for:

- "behavior issues" (Cambodian elementary school student);
- "student behavior modification" (Latino seventh grader);
- "is easily persuaded by peers, is often late to school and classes" (Latina eighth grader);

- "engaged in profanity and willfully defied authority" (Black eighth grader);

- "caus[ing] daily disruptions by arriving late to nearly all of her classes" (Latina seventh grader);

- "poor attendance/grades. Lack of motivation. Mother has not been involved" (Native American eighth grader);

- "disrespectful towards peers and staff. Habitual foul language, refuses to follow rules" (Latino seventh grader with likely disability); and

- "caused daily classroom disruptions. Uses inappropriate language and refuses to do classwork" (Black sixth grader).

48.    As these referrals demonstrate, an alleged violation of Section 601 is assessed not by any specific metric, but by an indeterminate and wholly subjective assessment of a student's behavior. The citations included on Probation contracts are no clearer. For example, Defendants have placed children on probation contracts for such vague and innocuous reasons as:

- "incorrigible minor" (Latina eighth grader from Mountain View Middle School, Beaumont Unified School District);

- "Suspension, Defiance, Disruptive Behavior, Previous MH Intervention" (white eighth grader from Riverside Unified School District);

- "601 (Defiance and Disruptive Behavior)" (Latino eighth grader from Mira Loma Middle School, Jurupa Unified School District); and

- "school discipline" (Latino fifth grader from Dr. Carreon Jr. Academy, Desert Sands Unified School District).

49.    Often, Probation merely cites the catch-all phrase "601 WIC," with no further specification, as the basis for placing children on YAT probation. Other times, Probation omits any reference to Section 601 or any other code section and

1    instead cites "school discipline," "grades / behavior," "disruptive school behavior

2    and bullying," and other school-related behavior on a YAT probation contract,

3    adding to the uncertainty. Since 2005, Probation has swept into its supervision more

4    than 12,971 children who had no previous history of court or probation involvement

5    merely because Probation deemed the child to be "at risk" for future misbehavior

6    and thus "soon to be within the [juvenile court's] jurisdiction" under Section 654.

7            50.     The terms of Sections 601 permit not only an arbitrary, but also a

8    racially discriminatory exercise of law enforcement power. For example, one

9    referral to YAT for an eleven-year-old sixth grader was in part based on the child's

10   perceived "use [of] 'race card' against [school] staff," suggesting that students who

11   challenge racial discrimination by school staff may be deemed offenders and "at

12   risk" of becoming criminals. In Riverside County, and across the state, Black

13   children are more likely than others to be charged with violating Section 601.

14   Between 2003 and 2016, Black children in Riverside County were two and a half

15   times more likely than their white counterparts to be referred to YAT under Section

16   601. Latinx children were also almost one and half times more likely than their

17   white peers to be referred to YAT under Section 601. Riverside County's racial

18   discrimination and abuse parallels findings in the context of school discipline, where

19   racial disparities are most prevalent in discipline for subjectively-defined offenses,

20   such as "disrespect."

21           51.     During the 2015–16 school year, Black children were referred to YAT

22   at nearly three times their rate of enrollment countywide, and Black boys in

23   particular were referred to YAT at *over* three times their rate of enrollment. About

24   thirty-two percent of Riverside County students are Latinx, but Latinx students were

25   more than thirty-nine percent of all YAT referrals during the 2015–16 school year.

26   A significantly greater proportion (thirty percent) of referrals for Latinx students

27

28

1   were for the lowest-level, Section 601 offenses (defiance, incorrigibility, curfew and

2   truancy), as compared to students in other racial groups.

3          52.    Riverside County persistently abuses Section 601, ensnaring children

4   experiencing grief, trauma, mental health issues, or behavioral disabilities and

5   subjecting them to probation supervision and the criminal system. For example, one

6   sixth grader was targeted for YAT after a conversation between an administrator and

7   the student's parent revealed that the child was experiencing "[a]nger/grief issues[,

8   is s]eparated from his father[, and] his [u]ncle died last year." A Black seventh

9   grader who was experiencing "grief over loss of [her] baby sister" was similarly

10  referred to YAT probation for "grief, bullying, and instigation." A middle school

11  principal who knew that an eleven-year-old boy was homeless nonetheless sent the

12  child to Probation because he was "frequently absent from school." Under the vague

13  terms of the law, the trauma and hardship associated with death and experiencing

14  homelessness can be cited to sweep children into an unconstitutional program that

15  turns their normal, age-appropriate reaction to difficult circumstances into

16  "offenses," sending them into a pipeline to the criminal justice system.

17  D.     Defendants Disregard Fundamental Due Process Protections in Placing

18         Children on Probation

19         53.    Defendants have targeted and funneled thousands of children who

20  would not otherwise be drawn into contact with the juvenile system, imposed

21  onerous demands, and abused outmoded and vague statutory provisions. Further,

22  Defendants, as a policy, practice, or custom, operate YAT in a manner that violates

23  fundamental tenets of procedural due process, inducing "consent" that is not

24  voluntary, knowing, or intelligent and is instead made without adequate notice or the

25  advice of counsel and absent oversight or a meaningful opportunity to be heard by

26  an independent arbitrator.

27

28

SMRH:227737035.1

54.     Defendants authorize, approve, and encourage officers to use as little as a phone call to notify children and their families of referral to YAT. This practice fails to ensure that children have sufficient notice of the allegations against them and the consequences they face. A child's referral to the YAT program initiates a one-sided process controlled by Probation that operates without procedural safeguards that are fundamental to a lawful and credible justice system.

55.     Even the most substantial form of notice contemplated by Defendants, a letter, falls far short of what due process requires. The letter is printed on Probation letterhead and indicates that the child was referred to YAT probation, which is described as a "diversion program." Because a referral can be made by anyone, for any reason, this may be the first time that a child and her family learn that she is accused of committing an offense or being vaguely "at risk" of committing a criminal offense. Information describing the reason for referral is limited to at most a legal code citation and a police report number, if one exists. The letter fails to provide the text describing the law the child allegedly violated, or any description of the conduct the child allegedly engaged in. This complete failure of notice places the burden on children and their families to figure out why they are required to meet with Probation.

56.     Probation's letter also fails to provide any explanation of the child's rights, the juvenile court process, an explanation of the requirements of YAT probation, or the consequences that follow from being placed on YAT probation. Noticeably absent from the letter is any statement informing the child and the child's family that YAT probation is entirely voluntary. Instead, the terms of the letter indicate that compliance is required. The letter sometimes includes language indicating either that an appointment has been scheduled for a particular date and time, or that the parent "must contact [the probation officer] as soon as possible" to schedule an appointment. Both of these provisions convey that meeting with the

probation officer is required. The probation officer may also include a warning in the letter that if a family fails to meet the appointment or response deadline, "the matter may be referred to the Riverside County District Attorney's Office for the filing of criminal charges in Juvenile Court."

57.    Moreover, the notice letter is written in English. Apparently recognizing that many families in Riverside County speak Spanish as a first language, the letters also state in Spanish: "If you do not speak English, please bring a member of your family or a friend to be your interpreter." The letter does not offer to provide a translation of the letter or to provide an interpreter for the appointment. The failure to provide translation only adds to the power imbalance and the inability of the child, and the family, to comprehend the circumstances and make an informed choice regarding YAT probation.

58.    In other instances, and consistent with policy, practice, and custom, Probation fails to provide any formal written notification to a child and the child's family indicating that the child has been referred to YAT. Instead, Defendants inform the family by phone or other informal means. When notice is provided during a phone call or by other informal means, it fails to provide the most basic assurances of fair process. There are serious consequences if a family does not understand or fails to remember details communicated solely over the phone. According to Defendants, failure to attend a meeting could result in criminal charges or a determination that the family is ineligible for diversion. At this critical juncture, notice by phone is wholly insufficient.

59.    Children and their families thus arrive at the YAT probation meeting misled and believing that they face criminal charges and that they are required to meet with a probation officer, but without information about the charges, the juvenile court process, the terms and consequences of YAT probation, or their legal rights. In addition to the informational asymmetry, children who have never been in

trouble with the law before walk into a law enforcement setting and are surrounded by several experienced, sometimes armed, law enforcement officers. These meetings are held at YAT offices or police departments and are attended by probation officers and police officers, who may be visibly armed. Representatives of the District Attorney's Office are also actively involved in preparing for YAT contract meetings and can attend. In addition to the lack of adequate notice, children are also without appointed counsel to advise them.

60.     During the meeting, probation officers present children and their families with a YAT probation contract requiring compliance with numerous conditions to purportedly avoid the possibility of prosecution. Riverside County, however, does not prosecute Section 601 petitions, meaning that acquiescence to YAT in exchange for an agreement not to prosecute is entirely misleading, if not outright false. Moreover, children, and families, are not informed that the conditions of YAT probation are often more onerous than those they would face if they did not agree to YAT probation. For example, a first time possession of marijuana at school, if pursued, is punishable under California law by four hours of counseling and ten hours of community service, and no form of probationary supervision is authorized by the law. Cal. Health & Safety Code § 11357(d). However, children have been placed on probation supervision with many additional onerous terms for the same offense.

61.     Surrounded by law enforcement, and lacking basic information and advice of counsel, a child is presented in this meeting with a critical decision: if she declines to accept probation supervision at this moment, according to Defendants, she may be required to go to court and may not be offered diversion again. If she accepts YAT probation, she submits to onerous terms of supervision. The decision carries consequences of which the child will likely be unaware, seriously impairing her ability to evaluate her options.

62.     In these circumstances, a child cannot voluntarily, knowingly, or intelligently agree to YAT probation. Nor could their families or any adult. Defendant officers obtain acquiescence to YAT probation through a process marked by a complete lack of procedural safeguards and a coercive and intimidating environment.

63.     Under these conditions, the likelihood that Plaintiffs' constitutional rights will be violated is clear. Federal and state constitutional laws, as well as state statutory laws, protect various children's rights implicated by the YAT probation placement procedures and the determination of whether to choose YAT probation or defend against allegations in court. These include liberty and privacy interests as well as the right to a speedy trial and the right to remain silent. The right to counsel is also afforded to California Juveniles in all proceedings under California Welfare & Institutions Code sections 601 and 602. Cal. Welf. & Inst. Code § 634. Despite the clear implications of a decision to accept YAT probation on these firmly established rights, Probation has no policies in place to ensure that officers respect these rights or advise children regarding their rights.

E.     YAT Contract Conditions Exceed Statutorily Authorized Consequences and Unconstitutionally Intrude on Constitutional Rights

64.     When a child acquiesces to participate in YAT, she receives a six-month probation contract memorialized on a standard, pre-filled form, which includes a checklist of default terms of YAT probation supervision. Additional terms may be checked or amendments made during the meeting. The terms of YAT probation are numerous, including required compliance with curfew, weekly check-ins with probation, attendance at weekly classes, requirements to obey parents, probation, and school authorities, notifications of any absence or late arrival at school, drug testing, requirements to attend a corrections facility tour, and other terms. These terms are not drawn based on a nexus with the underlying offense.

65.     Pursuant to policy, practice, and custom, YAT probation imposes terms
that are often more onerous and invasive than even court-ordered probation for
similar offenses. The standard YAT probation contract permits YAT officers to
impose broad search conditions stating: "I will submit to search/test of my
person/vehicle/premises upon request of the Probation Officer or YAT member."
While this term encompasses testing, in some cases, a drug testing requirement is
also included as a separate line. Children, and their families, are not informed that
this term constitutes a waiver of their Fourth Amendment Rights. This term thus
allows Defendants to assert broad authority to search and surveille children and their
families, without even a determination of probable cause and without judicial
oversight at any point in the process.

66.     The Fourth Amendment prohibits the imposition of such broad search
conditions without a conviction or adjudication of delinquency. California Welfare
& Institutions Code section 654, cited by Defendants, does not extend authority to
impose search conditions. However, a blanket search term is included in
Defendants' standard YAT probation contract. Defendants have no standard advisals
of children's Fourth Amendment rights. Children are presented with these terms, in
the context of the highly imbalanced YAT contract meeting, and purportedly
broadly waive their Fourth Amendment rights by signing the probation contract.
Waiver in these circumstances is not and cannot be voluntary, knowing, or
intelligent.

67.     Pursuant to policy, practice, and custom, YAT team members also
regularly remove children from classes to conduct "check-ins" during the school
day. These check-ins interfere with a child's school engagement and are not
scheduled around the student's or school's needs, but on the basis of the YAT team
members' schedule. During these impromptu check-ins, YAT team members
question children about topics including their social life, grades, and classroom

subjects. While check-ins occur on a weekly basis, children do not always see the same YAT officer and have little understanding of the function of these check-ins.

68.    The standard YAT probation contract also includes overbroad directives that chill and infringe upon the child's First Amendment rights to expressive association, including prohibiting association with anyone "not approved of by YAT" and requiring that the child "have no negative contact with anyone," with no further definition of the nebulous term "negative contact."

69.    YAT probation terms also commonly require a child to write an apology letter about the alleged reason for referral. These letters are likely to include admissions and other statements that could be used against a child in court. However, Defendants do not advise children of their rights. Nor do they provide any explanation of how these letters will be stored or used, and no assurance regarding whether the letters will be treated as confidential. YAT officers obtain a substantial amount of additional personal and sensitive information about the child and their families and provide no assurance regarding how they will use and store this information or under what circumstances the information may be disclosed to others.

F.    <u>Privacy Implications</u>

70.    YAT probation interferes with children's privacy. Defendants collect a wide array of private information about a child, such as: education records, counseling records, risk assessments, letters of apology, photographs, records of supervision contacts and home searches, and drug tests. YAT officers including law enforcement and the District Attorney's office engage in "an ongoing sharing of information" compiled about children through the course of YAT probation. Information may also be shared with other law enforcement agencies, such as gang task force officers.

71.    YAT requests that schools making referrals provide "Discipline Records; Transcripts/Grades; and Attendance Records." These records are supplied without parent or student consent, despite the fact that these records are subject to close confidentiality rules under the Family Educational Records and Privacy Act, 20 U.S.C. § 1232g. In Murrieta, for example, YAT officers are given direct access to the school student records database. Information is also compiled from other law enforcement and social services data sources.

72.    During the YAT probation contract meeting, YAT officers ask families questions about "[w]ho lives in the home" including "names and date of birth or age," drug/alcohol abuse, domestic violence, probation or parole, weapons and ammunition, and any criminal history. They also conduct a risk assessment, using a standardized form asking questions about "[l]ack of knowledge by parents or guardians of minor's friends and activities" and a lack of age-appropriate rule-setting; whether there are "chronic discipline problems"; whether the minor has engaged in "substance abuse multiple times, beyond experimentation"; whether "any relative with whom the minor associates with [sic] has . . . a prison record" or "pending an adult or juvenile adjudication"; and whether the minor "associates with a gang or tagging crew." Children are also required to sign a release granting YAT officers access to highly personal counseling records.

73.    Children referred to YAT probation are assigned a Central Intake Division ("CID") number, which is used to track information about the child in Probation's Juvenile Adult Management ("JAMs") database. Upon information and belief, other agencies associated with YAT probation also record and maintain information about children in their own databases, using the same CID number or another unique identifier for the child. The files associated with a child's CID number remain even if the child is not ultimately placed on YAT probation.

Probation and other YAT officers create field contact notes describing their contacts with children through YAT. These notes are then entered into the child's case file.

74.    Defendants provide no explanation of the types of information gathered and retained on children who are placed on YAT probation. Nor do they provide information about how it will be stored, and what if any confidentiality protections are provided.

75.    Defendants do not uniformly provide children placed on YAT probation with information about sealing records, or inform children of the possibility that records will be maintained by Probation and other agencies associated with YAT probation.

G.    Future Consequences of Placement on YAT Probation

76.    Beyond the immediate and gross violation of children's constitutional and civil rights, probation supervision through YAT produces numerous additional injuries. Entry into a YAT probation contract fast-tracks future contact with the criminal system and increases the severity of consequences. Once a child has gone through the YAT probation, she is presumed ineligible for diversion programs in the future. Children are deprived of the "second chance" that the Welfare and Institutions Code contemplates for first-time, low-level offenders, and are instead diverted *into* the justice system for non-criminal behavior through YAT probation. Failure to complete YAT successfully can also be used against the juvenile in sentencing in any future juvenile court proceeding.[23]

H.    The YAT Probation Program Has a Significant Adverse Impact on Black and Latinx Children

77.    The racist design of the YAT probation program ensures that Black and Latinx youth are overrepresented in and disproportionately impacted by the

---

[23]    *See, e.g.*, *In re C.Z.*, 165 Cal. Rptr. 3d 409, 411 (Cal. Ct. App. 2013) (affirming denial of deferred sentence on basis of unsuccessful completion of Section 654 program).

1    program's constitutional deficiencies. In YAT, "risk" is fundamentally related to

2    race and ethnicity.

3        78.     Defendants' association of Black and Latinx youth with "risk" and

4    delinquency is epitomized by the Neighborhood Toxicity Formula, a metric

5    designed to guide where the YAT program focuses its operation. The Neighborhood

6    Toxicity Formula labels neighborhoods as more or less "toxic" based in part on their

7    racial, ethnic, and socio-economic demographics. Under this formula, a

8    neighborhood's toxicity increases when it has a large "non-white population," and is

9    largely populated by residents who are "Hispanic/Latino," "recent immigrants," or

10    "immigrants/temporary residents." The "Neighborhood Toxicity Calculation"

11    further codifies racial bias by measuring "toxicity" through variables that are

12    recognized code words for racial animus, including "dense multi-family housing,"

13    "concentration of crime-prone age groups," and "family size." *See, e.g.*, *Mhany*

14    *Mgmt. Inc., v. Cnty. Of Nassau*, 819 F.3d 581, 608 (2d Cir. 2016) (holding that

15    concerns from white community members that a proposed development would bring

16    "full families living in one bedroom townhouses, two bedroom co-ops," and "four

17    people or ten people in an apartment" suggested implicit racial bias via code words;

18    and referencing empirical evidence that opponents to affordable housing often

19    subtly reference immigrant families under the guise of fears that the proposed

20    development "will bring in 'families with lots of kids'"). The Neighborhood

21    Toxicity formula is set out in a 2005 program evaluation commissioned by

22    Defendants from California State University, San Bernardino and used to make

23    recommendations on the communities within Riverside County where Defendants

24    should focus in operating the YAT program.

25        79.     The racist assumption that a person's race or ethnicity makes them

26    more or less "at risk" of future criminal behavior carries through to the day-to-day

27    implementation of the YAT program. Probation uses a Risk Assessment Form to

28

evaluate children referred and eligible for a YAT probation contract. The Risk Assessment Form used by Defendants is a four-point metric that purports to predict a child's risk of delinquency. The questions used to assign a risk score are broadly drafted, invite bias, and incorporate factors that are beyond individual control and perpetuate disparities and discrimination occurring elsewhere in the justice system and in school discipline. The risk assessment is not validated and the "risk" it purports to identify is generalized. The questions a YAT officer evaluates include whether: there is "[l]ack of knowledge by parents or guardians of minor's friends and activities" and a lack of age-appropriate rule-setting; whether there are "chronic discipline problems"; whether the minor has engaged in "substance abuse multiple times, beyond experimentation"; whether "any relative with whom the minor associates with has . . . a prison record" or "pending an adult or juvenile adjudication"; and whether the minor "associates with a gang or tagging crew." Based on these questions, a YAT officer assigns children a score between zero and four. This score is purportedly used to inform the decision to place a child on YAT probation.

80.    Defendants' Risk Assessment Form has a significantly adverse and disparate impact on Black and Latinx children. The broadly drafted criteria of the Risk Assessment Form result in higher risk scores for Black and Latinx children when compared to similarly situated white children. Excluding any referrals to YAT deemed ineligible, over twenty-four percent of white youth evaluated received a score of 0 or 1. In contrast, only seventeen percent of Latinx children and sixteen percent of Black children received a score of 0 or 1. White children are more than twice as likely as Black children (three percent and seven percent, respectively) and 1.6 times as likely as Latinx children to receive a risk score of 0. Similarly, when looking at the scores of 3 or 4, fifty-one percent of Black and Latinx youth were

1  assigned scores of either 3 or 4 points, where only forty-two percent of all white

2  youth referred received a score of 3 or 4 points.

3      81.    Defendants' policy, practice, and custom of disproportionately placing

4  Black and Latinx youth on YAT probation contracts creates an additional layer of

5  significantly adverse and disparate impact. Black and Latinx youth are less likely to

6  be scored a risk factor of zero or one. When they do receive a risk score of zero or

7  one, they are still more likely than white children with the same risk score to be

8  placed on probation. A full sixty percent of Latinx youth, and fifty percent of Black

9  youth who are evaluated as presenting no risk are nonetheless placed on probation.

10  In contrast, forty-five percent of white youth scoring zero are placed on probation.

11  Amongst youth scoring a 1 on the risk assessment, sixty-one percent of Black youth

12  and fifty-seven percent of Latinx youth are still assigned a probation contract, while

13  only fifty-two percent of white youth are assigned probation. At all levels, the Risk

14  Assessment Form favors white children and criminalizes Black and Latinx children.

15      82.    The racially disparate impact of Defendants' risk assessment and

16  assignment of YAT probation contracts are in keeping with the YAT probation

17  program's overarching approach to "toxicity" in the communities that make up

18  Riverside County. The racially discriminatory operation of the YAT program means

19  that Black and Latinx children are also disparately subjected to violations of their

20  constitutional rights, including their due process rights, their First Amendment

21  rights, and their Fourth Amendment rights.

22  I.    Allegations of Named Plaintiffs

23  **Andrew M.**

24      83.    Andrew M. was placed on YAT probation after goofing around with

25  friends was met with a series of escalating and improper law enforcement responses.

26  In the spring of 2017, Andrew was a thirteen-year-old eighth grader at Mountain

27  View Middle School in Riverside County. Andrew's school was patrolled by Officer

28

Lee, of the Moreno Valley Police Department. On February 9, 2017, during the lunch period, Andrew. was kicking an orange back and forth with friends in a makeshift game of soccer when he misdirected a kick and the orange rolled between Officer Lee's legs.

84.    Officer Lee approached Andrew from behind, placed him in handcuffs, and led him to the office.

85.    At the principal's office, Andrew saw Officer Lee whisper something to the assistant principal, Dr. Harris, before leaving the room. Thereafter, Dr. Harris turned to Andrew and stated "let me see your bag." Andrew handed over his backpack, which Dr. Harris then searched. She retrieved a small amount of marijuana. Following the search, Officer Lee issued Andrew a citation under California Health and Safety Code section 11357(d), a civil infraction for possession of marijuana.

86.    The next morning, Andrew's mother, Denise M., went to the school to pick up a copy of Andrew's discipline notice. Dr. Harris also gave her a copy of a YAT probation contract with Andrew's identifying information entered into the top portion. Based on her communications with Dr. Harris, Denise understood that Andrew would be required to submit to YAT probation to avoid being expelled from school.

87.    Several weeks later, on or about March 13, 2017, Andrew's mother received a phone call from Riverside County Probation Officer Natalie Holden, informing her that Andrew had been referred to YAT. Officer Holden informed Denise of some of the terms of YAT, including weekly check-ins and required community service hours. Denise requested a written confirmation of Andrew's referral and the required appointment details. In response, Officer Holden sent Denise an email confirming the date and time of Andrew's required appointment,

Tuesday, March 21, at 8:00 am, and the address of the police station where the meeting would occur.

88.     On the date of the required meeting, Andrew arrived at the police station with his father, uncle, and grandmother. They were met by a female, who on information and belief was a plainclothes police officer, who escorted them to a small windowless office. As the female officer led them to the room, a male, who on information and belief was a plainclothes police officer, joined. The male officer was armed with a gun. Andrew felt alarmed and intimidated at the police station. Seeing the police officer's gun exacerbated his fears. Sitting at the conference room table, the female officer questioned Andrew and his family members about Andrew and his family, including about the friends Andrew M. hangs out with and whether anyone in Andrew's family has been involved with the criminal justice system.

89.     The female officer then gave Andrew a contract for informal probation. Andrew's probation contract mirrored the standard probation contract used to train YAT officers. The contract indicated that a program of probation supervision under Section 654 was undertaken in lieu of filing a petition in Juvenile Court. Where the contract stated "You have been accused of the crime of ____" the female officer wrote "n/a. WIC 601/citation (infr.)," and included a nine-digit citation number. The contract included a number of pre-selected terms of supervision, including the requirements to abide by an 8:00 pm curfew, attend school and notify YAT officers of any absence before 9:00 am, "obey directives of the Probation Officer and YAT members," report to probation as directed, have "no negative contact with anyone," complete twenty-five hours of community service, write an essay, attend counseling as directed, check in with YAT every Thursday, attend a tour of a correctional facility, attend programming at the Moreno Valley Police Department every Tuesday afternoon, and maintain good grades. The contract indicated that probation supervision would last for a term of six months and that "any violation of the terms

1  and conditions may be grounds for referring the matter to the District Attorney's

2  Office for prosecution." The prohibition on associating with anyone not approved

3  was crossed out for Andrew's contract, and the blanket search term was not checked

4  off.

5       90.    The numerous requirements of Andrew's informal probation contract

6  exceeded the consequences contemplated by the legislature under Health and Safety

7  Code section 11357(d), which permits a maximum penalty of four hours of drug

8  education or counseling and up to ten hours of community service for a first offense,

9  and does not authorize any additional conditions of probation supervision.

10       91.    Although the contract included language stating that probation

11  supervision was undertaken with Andrew's consent, and that Andrew "understood

12  and agreed to comply" with the probation terms, Andrew did not believe he had a

13  choice in submitting to YAT probation and did not understand fully the terms of the

14  contract or the decision he purportedly made. Andrew, a thirteen-year-old boy who

15  had never come in contact with the criminal justice system before, found himself

16  pressured in a confining room with law enforcement at the police station. Across the

17  table from Andrew were two authority figures he believed to be police officers, one

18  of them visibly armed. In these circumstances, Andrew felt scared and intimidated.

19  Beyond the ticket he received from Officer Lee, Andrew and his family had no

20  information about the offense or offenses of which he was accused or the underlying

21  factual allegations. No one provided Andrew with the information that would have

22  allowed him to weigh the costs and benefits of opting to go to court or to accept

23  informal probation. He had no information about his legal rights, including his right

24  to counsel, which California law provides for any child petitioned under Section

25  601, *see* Cal. Welf. & Inst. Code § 634, or his right to remain silent.

26       92.    Andrew had no legal counsel who could have offered him guidance on

27  the considerations he faced in this critical stage. A defense attorney could have

28

advised Andrew that the terms of informal probation offered were in many ways more onerous than those a court could order under Section 11357(d). Counsel also could have warned Andrew that acquiescing to informal probation here, where he faced no criminal charges, would preclude the possibility of diversion in any future juvenile delinquency case and could be held against him in any future sentencing. So too, defense counsel could have probed the legal sufficiency of the alleged violation of Section 601, recognized that Section 601 cases are not heard by courts in Riverside County, and advised Andrew and his family of the possible defense based on the unlawful search of his backpack. In these circumstances—given the lack of adequate notice, the misleading information, and the coercive environment—Andrew could not have provided voluntary, knowing, and intelligent consent to submit to YAT probation.

93.    Although the YAT probation contract states that YAT probation is entered in lieu of prosecution, this did not hold true for Andrew. Shortly after being placed on YAT probation, Andrew also received a court summons for violation of California Health and Safety Code section 11357(d). Andrew appeared in Riverside County Superior Court on April 3, 2017 with his mother, his grandmother, and a Sigma Beta Xi mentor. Andrew had participated in Sigma Beta Xi's mentoring program since the sixth grade, and Sigma Beta Xi presented a letter on his behalf, attesting to his good character and his participation in a community service program. The court accepted Andrew's guilty plea and sentenced him to a suspended fine on the condition that he submit to one drug test and to complete ten hours of community services, which Andrew could complete with the Sigma Beta Xi program. Andrew subsequently completed these terms. Notably, these court-ordered conditions were less onerous than those specified in the YAT probation contract that was supposed to divert children like Andrew from harmful contact with the juvenile justice system.

94.     During the six-month term of YAT probation extending into Andrew's ninth-grade year, Andrew was pulled out of class to check in with YAT officers multiple times. The officers were not always the same. These check-ins caused Andrew to be tardy to his fourth-period class so frequently that his school called his grandmother, who then worried that Andrew would face school discipline for truancy.

95.     On one occasion, YAT officers removed Andrew from his fifth-period Spanish class even though he was taking a test that period. Andrew was then taken to another room and told to complete a fifty-question survey about how comfortable he felt with YAT. Andrew again told the officer that he was going to miss his Spanish quiz, but the officer still did not permit him to return to class. When Andrew was finally allowed to return to his Spanish class, he only had enough time to write his name, the date, and answer maybe just one question on the vocabulary test before class ended.

96.     In addition to school time check-ins, YAT officers visited Andrew's home multiple times to inquire about his whereabouts and activities. During one visit, an officer told Andrew's mother that he must attend a mandatory YAT programming meeting at the Moreno Valley Police Department, or else face severe consequences.

97.     According to the terms of the contract, Andrew's probation was set to end on September 21, 2017. Since that date, Andrew's mother has made several telephonic and in person requests for confirmation that Andrew successfully completed YAT probation and is no longer subject to probation terms. At one point, she was told that a confirmation letter was sent by mail and that another letter would be sent by mail. She never received a letter in the mail.

**Jacob T.**

98.    Jacob T. was placed on YAT probation following a disputed altercation he had with a female classmate on March 5, 2018. On that day, Jacob was a sixteen-year-old, ninth-grade student at Canyon Springs High School in Moreno Valley.

99.    Ten days later, on March 15, 2018, a Canyon Springs High School administrator called Jacob into his office to discuss the female student's allegations. When Jacob arrived, the administrator and an armed police officer were waiting in the office. The administrator called Jacob's mother, who insisted that they wait until she arrived to begin questioning Jacob. When Jacob's mother arrived, the administrator recounted the other student's allegations, which Jacob denied. The administrator suspended Jacob from Friday, March 16, 2018 to Thursday, March 22, 2018. The administrator did not discuss YAT with Jacob or his mother during this meeting.

100.    On March 19, 2018, four days after Jacob and his mother's meeting with the administrator, a probation officer called Jacob's mother. The officer told her that an assistant principal at Jacob's school had referred him to YAT. The probation officer provided only very minimal information about the program on the call, explaining that it was a probation program for "at-risk" teens with a number of requirements. The probation officer told Jacob's mother that Jacob. and his parents needed to go to the Moreno Valley police department station for a meeting.

101.    On March 22, 2018, Jacob and both of his biological parents arrived at the Moreno Valley Police Department as they had been directed. A probation officer escorted the family to a small, windowless room. Once in the room, a second officer, who on information and belief was a law enforcement officer, joined carrying a YAT probation contract. The second officer was armed with pepper spray and handcuffs. The police officer stated her name and began checking off the terms of the probation contract.

102.    During the meeting, the officers repeatedly told Jacob and his family that Jacob would be "a failure in life" and likely would end up in prison if he did not agree to participate in and successfully complete YAT. The officers failed to provide Jacob or his family time to consider the decision, failed to give them space to discuss their options, failed to provide any information about their legal rights, and failed to indicate that they could consult an attorney or have one present. The officers also failed to explain specifically why Jacob was referred to YAT. Jacob's probation contract, moreover, merely stated "601 WIC" as the offense for which Jacob is on YAT probation. Critically, the officers failed to explain that Jacob faced no criminal charges and that agreeing to informal probation would preclude Jacob's participation in any future diversion program. Without understanding the scope of the surveillance and believing that they had no choice in the matter, Jacob and his mother felt compelled to sign the YAT probation contract.

103.    After the family signed the contract, the officers revealed for the first time that YAT community service requirements were mandatory and that Jacob's room would be subject to unannounced searches.

104.    The terms of Jacob's YAT probation contract mirror those in the standard probation contract, including the requirements to abide by an 8:00 pm curfew, attend school and notify YAT officers of any absence before 9:00 am, "obey directives of the Probation Officer and YAT members," report to probation as directed, have "no negative contact [with] anyone," complete twenty-five hours of community service, write an essay, attend counseling as directed, check in with YAT every Thursday before 4:30 pm, attend a tour of a correctional facility, attend programming at the Moreno Valley Police Department every Tuesday afternoon, and maintain good grades. Among a long list of conditions, Jacob's probation terms also include a prohibition on association "with anyone not approved" by YAT: a term allegedly authorizing "search/test of my person/vehicle/premises upon request

of the Probation Officer or YAT member;" and an additional term requiring drug testing. The probation contract indicates that supervision will last for a term of six months and that "any violation of the terms and conditions may be grounds for referring the matter to the District Attorney's Office for prosecution."

105.    Jacob is still required to comply with all of the terms of YAT probation. In the three months since he was placed on probation, Jacob has been subjected to at least five home visits and has been interrogated by police officers, probation officers, and deputy district attorneys, all YAT members.

106.    Jacob currently attends Riverside County Education Academy. In or around May 2018, a probation officer pulled Jacob out of his fifth-period class to question him. Jacob was escorted into a conference room where he met with a probation officer alone. The officer interrogated Jacob for an extended period, causing Jacob T. to lose instruction time. Jacob and his parents are concerned that probation officers will continue pulling him out of class to interrogate him and interfere with his ability to perform well in school.

107.    Probation officers have told Jacob that he will be subjected to at least one mandatory drug test within the six-month probation term. During a mandatory YAT programming meeting in or about April 2018, a YAT officer pulled Jacob from the meeting, followed Jacob into the restroom, and demanded that Jacob provide a urine sample.

108.    Jacob and his family remain strongly dissatisfied with YAT, do not believe it has had or will have a positive impact on Jacob, and do not believe that Jacob T. has learned any new skills. In contrast, Jacob and his family believe that programs such as Sigma Beta Xi—in which Jacob is currently enrolled as a mentee—are much more effective in supporting Jacob and keeping him on track to graduate. Jacob's YAT probation is set to expire on September 22, 2018. However, a YAT officer told Jacob that his probation supervision period could restart.

**J.F.**

1

2    109.   J.F., a Black female, was sixteen years old when she enrolled as a

3    sophomore in Rancho Verde High School in Riverside County in the fall of 2017.

4    J.F. had moved from her grandfather's home in Arizona to live with her

5    grandmother, Cindy McConnell. J.F. struggled coping with her Oppositional Defiant

6    Disorder and had extreme difficulty waking up early in time for school, where her

7    first class started at 7:30 am. The school's and Defendants' response to J.F.'s

8    struggles and late arrivals—placing her on YAT probation—failed to help J.F. and

9    instead violated her rights.

10    110.   Defendants placed J.F. on YAT probation on February 23, 2018, less

11   than twenty-four hours after first meeting with officials from Val Verde Unified

12   School District and two law enforcement officers regarding J.F.'s late arrivals. The

13   officials implied that J.F. would be involuntarily transferred to a county continuation

14   school, and her grandmother would face criminal charges, if J.F. did not acquiesce

15   to YAT probation. Pressured, cornered, and concerned, J.F. felt she had no

16   alternative but to submit to YAT. Defendants did not provide J.F. with notice of the

17   violation she was accused of committing, information about the juvenile court

18   process and the consequences and terms of YAT probation, or advise her of her

19   legal rights. J.F. did not have the benefit of counsel or an impartial decision maker.

20   In these circumstances, J.F. could not give voluntary, knowing, or informed consent

21   to subject herself to YAT probation.

22    111.   J.F. first met with a School Attendance Review Board ("SARB")

23   official on or about late December 2017 or early January 2018. During that meeting,

24   the SARB official told J.F. and her grandmother, Cindy McConnell, that the school

25   district would help J.F. solve her attendance issues through a series of graduated

26   responses. When Cindy received notice of a mandatory meeting scheduled for

27

28

February 22, 2018, she and J.F. expected the meeting would be similar to the prior meeting with the SARB official.

112.    Instead, when they arrived on February 22, J.F. and Cindy quickly realized that it was unlike the previous meeting. J.F. and Cindy were escorted into a conference room where multiple District officials, including a Val Verde Unified School District School Board Member, Riverside County Probation Officer German Regin and an officer, who on information and belief is a law enforcement officer, and a woman typing formal meeting notes were waiting. During that meeting, the SARB panel chastised J.F. for her absences and poor grades, implied that the District could involuntarily transfer her to Val Verde Continuation School, and suggested that Cindy could face criminal charges if J.F.'s attendance did not improve. J.F. tried to explain her difficulty waking up early enough to make her first class at 7:30 am. The SARB panel told J.F. that if she wanted to improve her attendance and avoid involuntary transfer, she would have to submit to YAT probation. The SARB panel informed J.F. and Cindy that a mandatory YAT meeting was scheduled for 9:00 am the following day, February 23, 2018.

113.    At 9:00 am on February 23, 2018, less than twenty-four hours after the SARB hearing, J.F. and Cindy arrived for the mandatory YAT meeting at Val Verde High School. There, they were met by Probation Officer Regin, of the Riverside County Probation Department, who escorted them to his office. Though they believed YAT probation was the only way to prevent J.F. from being pushed out of her school and Cindy from facing criminal charges, as the SARB panel suggested, neither J.F. nor Cindy knew exactly why J.F. was being put on probation.

114.    After extensive questioning by Officer Regin, another officer briefly entered the room, stated his name, and plainly stated that he would be conducting visits to J.F. and Cindy's home. After that officer left, Officer Regin unapologetically gave J.F. and Cindy the probation contract that included

1  preselected terms, consistent with the standard YAT probation contract, spent no

2  more than a few minutes describing the YAT probation program, and instructed J.F.

3  to read the contract herself, without providing any explanation of the probation

4  contract's terms.

5      115.   J.F.'s probation contract reflects that she is charged with the crime of

6  "601 WIC," but no YAT officer explained what this means. The contract also

7  indicates that YAT probation was proposed "[i]n lieu of filing a Petition with the

8  Juvenile Court." J.F. and Cindy are uncertain but believe J.F. was placed on YAT

9  probation either for attendance issues or for bad grades, both of which were

10 mentioned by the SARB panel and Officer Regin. Looking at the term "601 WIC,"

11 written on J.F.'s probation contract, Cindy wondered whether YAT was for low-

12 income families that would qualify for the federal nutrition and health program for

13 Women, Infants, and Children, commonly referred to as "WIC."

14     116.   All but one condition—mandatory check-ins—were preselected on

15 J.F.'s YAT probation contract. As terms of her probation, J.F. is required to:

16         • Obey all laws and ordinances,

17         • adhere to a 10:00 pm curfew,

18         • "obey parents or guardian and keep them informed of [ ]

19           whereabouts and associates,"

20         • attend school every period of every day and notify YAT officers

21           of any absence before 9:00 am,

22         • "obey school officials/rules,"

23         • report to probation as directed,

24         • "obey directives of the Probation Officer and YAT members,"

25         • "not associate with anyone not approved by parent, YAT";

26         • have "no association with negative influences,"

27

28

- have "no negative contact with anyone, including, parent, school staff, peers, YAT members, or law enforcement,"
- submit a letter of apology,
- complete "20+" community service hours,
- write an essay,
- attend counseling as directed and continue receiving therapy services from the County,
- attend a tour of a correctional facility,
- attend programming every Tuesday afternoon,
- "improve and maintain good grades and attendance,"
- maintain "good behavior at home and school,"
- "submit to search/tests of [her] person/vehicle/premises upon request of the Probation Officer of YAT member," and
- "attend any awareness classes deemed necessary. Parent(s) to attend parenting if recommended."

117.    The probation contract also reflects that J.F. "understand[s that] home visits will be conducted by the team on an as needed basis," and threatens that "any violation of these terms and conditions may be grounds for referring the matter to the District Attorney's Office for prosecution."

118.    The numerous conditions in J.F.'s YAT probation contract conflict with the response to school attendance problems contemplated by the legislature which created SARBs to "[d]ivert pupils with serious attendance and behavioral problems from the juvenile justice system to agencies more directly related to the state public school system," namely, "community-based and school-based programs." Cal. Educ. Code § 48325.

119.    Beyond the SARB meeting on February 22, 2018, and Officers Regin's vague references to attendance and grades, J.F. and her grandmother Cindy had no

information about the offense of which she was accused. Without knowing the direct consequences of accepting YAT probation, that she had the right to reject probation or particular terms, and without an understanding or advisement of the rights she waived, J.F. and Cindy had no opportunity to meaningfully weigh the costs and benefits of opting to go to court or to accept this purported informal probation. J.F. had no information about her legal rights, including her right to consult with counsel and her right to remain silent. Nor was there an impartial decision maker present.

120.   J.F. had no legal counsel who could have offered her much-needed guidance on the considerations she faced in this critical stage. A defense attorney could have advised J.F. that the terms of informal probation offered were excessive and inappropriate under California law and warned J.F. that acquiescing to informal probation here, where she faced no criminal charges, would preclude the possibility of diversion in any future case and could be held against her in any future sentencing. So too, defense counsel could have probed the legal sufficiency of the alleged violation of Section 601 and recognized that Section 601 cases are not heard by courts in Riverside County. In these circumstances, J.F. could not have provided voluntary, knowing, or intelligent consent to submit to YAT probation.

121.   Following J.F.'s entry into YAT probation on February 23, 2018, Officers Regin and a second officer have conducted at least five unannounced home visits to Cindy and J.F.'s home. During each visit, one officer has entered the home, observed the general areas, and stood at J.F.'s bedroom door to observe her room while asking J.F. about personal matters, including how J.F. treats Cindy, maintains cleanliness in her room, and conducts herself in romantic relationships.

122.   A different YAT officer whose name J.F. does not know has also removed J.F. from class on several occasions for extensive meetings, interfering with her learning time. These visits typically occur during J.F.'s fifth-period History

class, or sixth-period PE class. In addition to officers removing J.F. from class, Ms. Estrada, a woman identified as a YAT counselor, pulls J.F. out of school about once a week for about one hour. The meetings begin during J.F.'s second-period English class. Ms. Estrada is abrasive, judgmental, and undermines the progress that J.F. and Cindy have made with J.F.'s therapist.

123.   J.F. is enrolled in summer school at Val Verde High School, a continuation school. Her classes take place directly across the hall from the designated YAT office. Due to the compressed timeframe, a single day of summer school covers an entire week's worth of class content. Despite the valuable instructional time, YAT officers have continued to pull J.F. from class during summer school. J.F., who is deficient in school credits, is fearful that YAT officers will continue removing her from class time during summer school, causing her to miss valuable educational time and compromising her ability to complete the summer school credits she needs.

124.   J.F. finds the required YAT class topics—including murder and felony murder—completely unrelated to the reason she was placed on YAT probation. The meetings are also burdensome, beginning at the Perris Sheriff's Station less than one hour after J.F.'s regular school day ends in Val Verde, making it more difficult to complete her school homework.

125.   J.F. is subject to her YAT probation contract and the attendant probation supervision until August 23, 2018.

**Sigma Beta Xi**

126.   Sigma Beta Xi is a non-profit organization providing mentoring services primarily to Riverside County children of color, including children with disabilities, whose educational success is at risk due to poor grades, discipline, or other factors. Sigma Beta Xi contracts with public schools within Riverside County, who refer children to receive mentoring and support from Sigma Beta Xi. Sigma

Beta Xi's mission is to establish strong families and communities by building an organization of diverse young men and women who will exemplify leadership and professionalism based upon the principles of brotherhood, sisterhood, excellence, endurance, wisdom, service, and unity.

127.   Mentoring is central to Sigma Beta Xi's mission. Sigma Beta Xi employs twelve mentors who work to understand the environment from which the child comes to school, provide one-on-one mentoring and leadership development, and ultimately find ways to bring the child to her full potential. Sigma Beta Xi creates an individualized plan for each mentee that responds to the child's unique needs. Sigma Beta Xi offers more intensive mentoring services for mentees with greater needs, including additional mentoring hours, more support coordinating with caretakers and other service providers, more referrals to outside counseling, and additional extracurricular activities and field trips designed to foster leadership skills. Sigma Beta Xi also enrolls a select number of students in two enhanced programs. The first is its Rites of Passage Program, a resource-intensive support program that provides counseling services for students and their families and helps them deal with trauma, anger, anxiety, and depression. The second is its Positive Youth Justice Initiative Program, a leadership development program that trains and empowers youth to engage in community organizing and transform the criminal justice system.

128.   Sigma Beta Xi offers a continuum of engagement and leadership opportunities for mentees as their involvement in the organization increases. All mentees receive one-on-one mentoring each week. Once mentees are developmentally ready for sharing in a group setting, mentees join Sigma Beta Xi's weekly group mentoring sessions. After sustained involvement with Sigma Beta Xi, mentees are given additional opportunities to develop their leadership and help shape the organization, such as by interviewing prospective mentors. A growing

1   number of mentees also join Sigma Beta Xi's student fraternity, which operates

2   under the Sigma Beta Xi name and provides additional opportunities for leadership

3   and community service.

4        129.   Numerous Sigma Beta Xi mentees, including Andrew M. and Jacob T.,

5   have been placed on YAT probation.

6        130.   As a result of mentees' experiences with YAT, Sigma Beta Xi's

7   mission of building a diverse group of young professional leaders has been

8   significantly frustrated. Mentees who currently are or have been on YAT probation

9   are often more distrustful of adults, including their Sigma Beta Xi mentors. As a

10   result, these mentees make slower progress in their mentoring sessions and take

11   longer to advance, or do not fully advance, through Sigma Beta Xi's continuum of

12   engagement and leadership opportunities.

13        131.   To address its frustrated mission, Sigma Beta Xi has been forced to

14   divert its limited resources in various ways. Sigma Beta Xi has assigned mentees

15   who are or were on YAT probation to additional and more intensive services to

16   ensure mentees can build trusting and effective relationships with mentors despite

17   the mentees' experience with YAT probation. Mentors also engage in extra work to

18   ensure that mentees involved with YAT are not prohibited from participating in

19   Sigma Beta Xi activities and do not face additional consequences for participating in

20   activities designed to provide opportunities for positive development. For example,

21   Sigma Beta Xi had to intervene when Probation accused a mentee of violating the

22   terms of her YAT probation by traveling to a student leadership summit in Los

23   Angeles with Sigma Beta Xi. In other circumstances, Sigma Beta Xi mentors

24   transport mentees to comply with onerous YAT probation supervision requirements.

25   Additionally, Sigma Beta Xi mentors now require more training about YAT to

26   ensure they can effectively support mentees whose lives are made more difficult by

27   the program.

28

132.   If Sigma Beta Xi were not required to spend these additional resources to address the frustration of mission created by Defendants' operation of YAT, it would be able to devote these resources to activities that further its mission. Sigma Beta Xi would be able to spend more time with individual mentees on positive leadership building activities, rather than addressing needs tied to complying with probation supervision. It could also use these resources to, for example, provide mentoring services to additional children in Riverside County, such as enrolling more children in its Rites of Passage and Positive Youth Justice Initiative programs.

## V.  CLASS ACTION ALLEGATIONS

133.   Jacob T. and J.F. ("Class Plaintiffs") bring this class action on behalf of themselves and all others similarly situated pursuant to Federal Rule of Civil Procedure 23(b)(2).

134.   Class Plaintiffs seek to certify a class defined as follows:

> All children in Riverside County who have been referred to the Riverside County Youth Accountability Team ("YAT") program pursuant to Cal. Welf. & Inst. Code § 601, and who have either been placed on a YAT probation contract or have been referred but not yet placed on a YAT probation contract.

Those within the class are referred to herein as the "Class Members."

135.   The Class Members are so numerous that individual joinder of their members is impractical. Each year, thousands of children are referred to YAT. According to public records obtained from the Probation Department, in 2015, YAT received 1505 referrals. Each year, probation places between 400 and 500 children on YAT probation contracts. Of those, hundreds are referred to or placed on YAT pursuant to California Welfare and Institutions Code Section 601. The number of unnamed future class members who will be referred and subject to YAT probation through the policies, practices, and customs alleged herein is unknown and unknowable.

136.    There exist questions of law and fact common to the entire class. These common questions of fact and law include, without limitation:

a)    Whether Defendants are required to provide adequate notice to children who are referred to YAT of the basis and circumstances of their referral.

b)    Whether Defendants are required to provide adequate notice to children who are referred to YAT of any statutes, other laws or rules they are alleged to have violated in connection with their YAT referral.

c)    Whether Defendants are required to provide adequate explanation to children who are referred to YAT of the requirements of the YAT program and any consequences of participating in the YAT program.

d)    Whether Defendants are required to provide adequate notice to children who are referred to YAT that participation in YAT will preclude them from participating in other diversionary programs in the future.

e)    Whether Defendants are required to adequately advise children of their right to consult with legal counsel before the child decides whether to agree to a YAT probation contract.

f)    Whether Defendants are required to provide adequate notice to children who are referred to YAT that agreeing to YAT may require them to submit to searches of their homes or persons.

g)    Whether Defendants are required to provide adequate notice to children who are referred to YAT that agreeing to YAT may require them to waive their rights to associate with "anyone not approved" by YAT.

h)  Whether Defendants are required to provide adequate notice to children who are referred to YAT that agreeing to YAT may prohibit them from having "negative contact with anyone," in violation of their expressive association rights.

i)  Whether California Welfare & Institutions Code § 601 is unconstitutionally vague.

j)  Whether Defendants are required to operate the YAT program in a non-discriminatory manner that does not have a disproportionate effect on different racial or ethnic groups of children.

k)  Whether Defendants may use a risk assessment instrument that scores Black and Latinx children as having a higher risk of criminality as a basis for YAT placement.

137.  Class Plaintiffs' claims are typical of those of the Class members in that they are children in Riverside County who were each referred to and placed on a YAT probation contract, and suffer the resulting violations of their civil rights under Constitutional and statutory laws due to Defendants' implementation of the YAT probation program.

138.  Class Plaintiffs will fairly and adequately protect the interests of the Class Members. The Class Plaintiffs have a personal interest in the subject matter of this litigation and have no interests antagonistic to the interests of the class. Class Plaintiffs are represented by competent and experienced counsel in class action, civil rights, and constitutional litigation.

139.  Defendants have acted and refused to act on grounds generally applicable to the Class Members, thereby making appropriate final injunctive relief and/or corresponding declarative relief with respect to the class and the subclasses as a whole. Fed. R. Civ. P. 23(b)(2).

140.   The prosecution of individual actions against Defendants by individual class members would create a risk of inconsistent and varying adjudications and the establishment of incompatible standards of conduct across the Plaintiff Class. Fed. R. Civ. P. 23(b)(1).

## FIRST CLAIM FOR RELIEF

**Violation of the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**
**(Deprivation of the Right to Procedural Due Process)**
**(All Plaintiffs Against All Defendants)**

141.   Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 140 as though fully set forth herein.

142.   This claim is brought by Plaintiffs Andrew M. and Sigma Beta Xi on behalf of themselves and by Plaintiffs Jacob T. and J.F. on behalf of themselves and the members of the proposed class.

143.   The Procedural Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.

144.   Plaintiffs have a fundamental interest in their liberty to be free from the constraints of probationary supervision imposed by Defendants' YAT probation program. Defendants deprive Plaintiffs of their liberty interests without adequate procedural protections.

145.   Defendants have a policy, practice, and custom of placing children on YAT probation through unfair procedures that deny Plaintiffs the ability to act in their own best interest and to make a voluntary, knowing, and intelligent decision regarding whether to accept YAT probation.

146.   Defendants' policies, practices, and customs violate Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution and cause

1  serious, irreparable, and lasting harm to these children, which they will continue to

2  suffer in the absence of relief.

3       147.  The mission of Sigma Beta Xi is also frustrated by the unlawful policy,

4  practice, and custom of Defendants, and Sigma Beta Xi continues to divert resources

5  as a result.

6  **SECOND CLAIM FOR RELIEF**

7  **Violation of the Due Process Clause of the Fourteenth Amendment**
**to the U.S. Constitution**

8  **42 U.S.C. § 1983**
**(Welf. & Inst. Code § 601 is Overly Vague on Its Face in**

9  **Violation of Due Process)**
**(All Plaintiffs Against All Defendants)**

10

11       148.  Plaintiffs incorporate herein by reference the allegations of Paragraphs

12  1 through 140 as though fully set forth herein.

13       149.  This claim is brought by Plaintiffs Andrew M. and Sigma Beta Xi on

14  behalf of themselves and by Plaintiffs Jacob T. and J.F. on behalf of themselves and

15  the members of the proposed class.

16       150.  The Due Process Clause of the Fourteenth Amendment protects against

17  the deprivation of life, liberty, or property without due process of law.

18       151.  The terms of Section 601(b)—prohibiting "persistent or habitual refusal

19  to obey the reasonable and proper orders or directions of school authorities"—are

20  vague on their face. These terms fail to define the offense sufficiently to provide

21  notice to the average child who is expected to comply with its terms of what conduct

22  is prohibited or to provide sufficient guidance to those charged with its enforcement,

23  authorizing and encouraging arbitrary and discriminatory enforcement.

24       152.  Section 601 is the basis for Plaintiffs' referral to and their placement on

25  YAT probation.

26

27

28

153.   Defendants' enforcement of Section 601(b) causes serious, irreparable, and lasting harm to Plaintiffs, and they will continue to suffer irreparable harm in the absence of relief.

154.   The mission of Sigma Beta Xi is also frustrated by Defendants' enforcement of Section 601(b), and Sigma Beta Xi continues to divert resources as a result.

## THIRD CLAIM FOR RELIEF

**Violation of the Due Process Clause of the Fourteenth Amendment
to the U.S. Constitution
42 U.S.C. § 1983
(Welf. & Inst. Code § 601 is Vague as Applied in Violation of Due Process)
(All Plaintiffs Against All Defendants)**

155.   Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 140 as though fully set forth herein.

156.   This claim is brought by Plaintiffs Andrew M. and Sigma Beta Xi on behalf of themselves and by Plaintiffs Jacob T. and J.F. on behalf of themselves and the members of the proposed class.

157.   The Due Process Clause of the Fourteenth Amendment protects against the deprivation of life, liberty, or property without due process of law.

158.   Defendants apply Section 601, *inter alia*, through their criteria for referral and in their citation of Section 601 to place children on YAT probation. Defendants, as a matter of policy, practice, and custom, apply Section 601 in a manner that is overly vague. As applied by Defendants, Section 601 fails to define the offense sufficiently to provide notice to the average child of what conduct is prohibited or to provide sufficient guidance to those charged with its enforcement, authorizing and encouraging arbitrary and discriminatory enforcement.

159.   Defendants' policies, practices, and customs violate Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution and cause

1  serious, irreparable, and lasting harm to these children, which they will continue to
2  suffer in the absence of relief.

3      160.   The mission of Sigma Beta Xi is also frustrated by Defendants' policy,
4  practice, and customs, and Sigma Beta Xi continues to divert resources as a result.

5  ### FOURTH CLAIM FOR RELIEF

6  **Violation of the Fourth Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**
7  **(Unreasonable Search And Seizure)**
**(Plaintiffs Sigma Beta Xi., Jacob T., and J.F. Against All Defendants)**
8

9      161.   Plaintiffs incorporate herein by reference the allegations of Paragraphs
10  1 through 140 as though fully set forth herein.

11      162.   This claim is brought by Plaintiff Sigma Beta Xi on behalf of itself and
12  by Plaintiffs Jacob T. and J.F. on behalf themselves and the members of the
13  proposed class.

14      163.   The Fourth Amendment of the United States Constitution protects the
15  right to be free from unreasonable search and seizure.

16      164.   Defendants, as a matter of policy, practice, and custom, *inter alia*,
17  impose blanket search terms as a condition of YAT probation. These terms, as
18  incorporated in YAT probation contracts, purport to authorize search of a child's
19  person—including through drug testing—property, and premises. Defendants rely
20  on these terms of YAT probation contracts to conduct drug testing and home
21  searches of Plaintiffs without a warrant.

22      165.   As a matter of policy, practice, and custom, Plaintiffs are not informed
23  that these terms constitute a waiver of their rights under the Fourth Amendment. The
24  terms are presented in a context that is coercive and in which Plaintiffs, children
25  facing their first encounter with the justice system, are utterly lacking in relevant
26  information. Any purported waiver or blanket consent to searches of their person,
27  home, and property is not voluntary, knowing, or intelligent and is thus invalid.

28

166.   Defendants' policies, practices, and customs violate Plaintiffs' rights under the Fourth Amendment of the United States Constitution and cause serious, irreparable, and lasting harm to these children, which they will continue to suffer in the absence of relief.

167.   The mission of Sigma Beta Xi is also frustrated by Defendants' policies, practices, and customs, and Sigma Beta Xi continues to divert resources as a result.

## FIFTH CLAIM FOR RELIEF

**Violation of the First Amendment to the U.S. Constitution**
**42 U.S.C. § 1983**
**(Overbreadth, Violation of Freedom of Expressive Association)**
**(Plaintiffs Sigma Beta Xi, Jacob T., and J.F. Against All Defendants)**

168.   Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 140 as though fully set forth herein.

169.   This claim is brought by Plaintiffs Sigma Beta Xi on behalf of itself and by Plaintiffs Jacob T. and J.F. on behalf of themselves and the members of the proposed class.

170.   The First Amendment protects against overly broad laws that abridge the freedom of speech and the fundamental right to freedom of expressive association.

171.   Defendants, as a matter of policy, practice, or custom, impose YAT probation conditions that prohibit association with "anyone not approved" by Defendants and prohibit children from having "any negative contact with anyone." These terms are overbroad on their face because they reach a substantial amount of First Amendment protected activity. Any purported waiver or consent to such conditions is not knowing, voluntary, or intelligent and is thus invalid.

172.   Defendants' policies, practices, and customs violate Plaintiffs' rights under the First Amendment of the United States Constitution and cause serious,

1  irreparable, and lasting harm to these children, which they will continue to suffer in

2  the absence of relief.

3      173.   The mission of Sigma Beta Xi is also frustrated by Defendants' policy,

4  practice, and customs, and Sigma Beta Xi continues to divert resources as a result.

5  ### SIXTH CLAIM FOR RELIEF

6  **Violation of Art. I, § 7 of the California Constitution**
**(Deprivation of the Right to Procedural Due Process)**

7  **(All Plaintiffs Against All Defendants)**

8      174.   Plaintiffs incorporate herein by reference the allegations of Paragraphs

9  1 through 140 as though fully set forth herein.

10      175.   This claim is brought by Plaintiffs Andrew M. and Sigma Beta Xi on

11  behalf of themselves and by Plaintiffs Jacob T. and J.F. on behalf of themselves and

12  the members of the proposed class.

13      176.   The California Constitution, Article I, section 7 provides that "a person

14  may not be deprived of life, liberty, or property without due process of law."

15      177.   Plaintiffs have a fundamental interest in their liberty to be free from the

16  constraints of probationary supervision imposed by Defendants' YAT probation

17  program. Defendants deprive Plaintiffs of their liberty interests without adequate

18  procedural protections.

19      178.   Defendants have a policy, practice, and custom of placing children on

20  YAT probation through unfair procedures that deny Plaintiffs the ability to act in

21  their own best interest and to make a voluntary, knowing, and intelligent decision

22  regarding whether to accept YAT probation.

23      179.   Defendants' policies, practices, and customs violate Plaintiffs' rights

24  under Article I § 7 of the California Constitution and cause serious, irreparable, and

25  lasting harm to these children, which they will continue to suffer in the absence of

26  relief.

27

28

180.   The mission of Sigma Beta Xi is also frustrated by the unlawful policy, practice, and custom of Defendants, and Sigma Beta Xi continues to divert resources as a result.

### SEVENTH CLAIM FOR RELIEF

**Violation of Art. I, § 13 of the California Constitution**
**(Unreasonable Search And Seizure)**
**(Plaintiffs Sigma Beta Xi, Jacob T., and J.F. Against All Defendants)**

181.   Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 140 as though fully set forth herein.

182.   This claim is brought by Plaintiff Sigma Beta Xi on behalf of itself and by Plaintiffs Jacob T. and J.F. on behalf of themselves and the members of the proposed class.

183.   Article I, section 13 of the California Constitution protects the right to be free from unreasonable search and seizure.

184.   Defendants, as a matter of policy, practice, and custom, impose blanket search terms as a condition of YAT probation. These terms, as incorporated in YAT probation contracts, purport to authorize search of a child's person—including through drug testing—property, and premises. Defendants rely on these terms of YAT probation contracts to conduct drug testing and home searches of Plaintiffs without a warrant.

185.   As a matter of policy, practice, and custom, Plaintiffs are not informed that these terms constitute a waiver of their rights under the Fourth Amendment. The terms are presented in a context that is coercive and in which Plaintiffs, children facing their first encounter with the justice system, are utterly lacking in relevant information. Any purported waiver or blanket consent to searches of their person, home, and property is not voluntary, knowing, or intelligent and is thus invalid.

186.   Defendants' policies, practices, and customs violate Plaintiffs' rights under the Article I, section 13 of the California Constitution and cause serious,

1  irreparable, and lasting harm to these children, which they will continue to suffer in
2  the absence of relief.

3      187.  The mission of Sigma Beta Xi is also frustrated by Defendants policy,
4  practice, and customs, and Sigma Beta Xi continues to divert resources as a result.

5                    **EIGHTH CLAIM FOR RELIEF**

6  **Violation of Art. I, §§ 2a, 3 of the California Constitution**
   **(Overbreadth, Violation of Freedom of Expressive Association)**
7  **(Plaintiffs Sigma Beta Xi, Jacob T., and J.F. Against All Defendants)**

8      188.  Plaintiffs incorporate herein by reference the allegations of Paragraphs
9  1 through 140 as though fully set forth herein.

10      189.  This claim is brought by Plaintiffs Sigma Beta Xi on behalf of itself
11  and by Plaintiffs Jacob T. and J.F. on behalf of themselves and the members of the
12  proposed class.

13      190.  Article I, sections 2a and 3 of the California Constitution protect
14  against overly broad laws that abridge the freedom of speech and the fundamental
15  right to freedom of expressive association.

16      191.  Defendants, as a matter of policy, practice, or custom, impose YAT
17  probation conditions that prohibit association with "anyone not approved" by
18  Defendants and prohibit children from having "any negative contact with anyone."
19  These terms are overbroad on their face because they reach a substantial amount of
20  protected speech and expressive activity. Any purported waiver or consent to such
21  conditions is not knowing, voluntary, or intelligent and is thus invalid.

22      192.  Defendants' policies, practices, and customs violate Plaintiffs' rights
23  under Article I, sections 2a and 3 of the California Constitution and cause serious,
24  irreparable, and lasting harm to these children, which they will continue to suffer in
25  the absence of relief.

26      193.  The mission of Sigma Beta Xi is also frustrated by Defendants' policy,
27  practice, and customs, and Sigma Beta Xi continues to divert resources as a result.

28

### NINTH CLAIM FOR RELIEF

**Violation of Art. I, § 7 of the California Constitution**
**(Welf. & Inst. Code § 601 is Overly Vague on Its Face**
**in Violation of Due Process)**
**(All Plaintiffs Against All Defendants)**

194.    Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 140 as though fully set forth herein.

195.    This claim is brought by Plaintiffs Andrew M. and Sigma Beta Xi on behalf of themselves and by Plaintiffs Jacob T. and J.F. on behalf of themselves and the members of the proposed class.

196.    Article I § 7 of the California Constitution protects against the deprivation of life, liberty, or property without due process of law.

197.    The terms of Section 601(b)—prohibiting "persistent or habitual refusal to obey the reasonable and proper orders or directions of school authorities"—are vague on their face. These terms fail to define the offense sufficiently to provide notice to the average child who is expected to comply with its terms of what conduct is prohibited or to provide sufficient guidance to those charged with its enforcement, authorizing and encouraging arbitrary and discriminatory enforcement.

198.    Section 601 is the basis for Plaintiffs' referral to and their placement on YAT probation.

199.    Defendants' enforcement of Section 601(b) causes serious, irreparable, and lasting harm to Plaintiffs, and they will continue to suffer irreparable harm in the absence of relief.

200.    The mission of Sigma Beta Xi is also frustrated by Defendants' enforcement of Section 601(b), and Sigma Beta Xi continues to divert resources as a result.

1
2
3

# TENTH CLAIM FOR RELIEF

**Violation of Art. I, § 7 of the California Constitution**
**(Welf. & Inst. Code § 601 is Vague as Applied in Violation of Due Process)**
**(All Plaintiffs Against All Defendants)**

4   201.   Plaintiffs incorporate herein by reference the allegations of Paragraphs

5   1 through 140 as though fully set forth herein.

6   202.   This claim is brought by Plaintiffs Andrew M. and Sigma Beta Xi on

7   behalf of themselves and by Plaintiffs Jacob T. and J.F. on behalf of themselves and

8   the members of the proposed class.

9   203.   Article I, section 7 of the California Constitution protects against the

10   deprivation of life, liberty, or property without due process of law.

11   204.   Defendants apply Section 601 through their criteria for referral and in

12   their citation of Section 601 to place children on YAT probation. Defendants, as a

13   matter of policy, practice, and custom, apply Section 601 in a manner that is overly

14   vague. As applied by Defendants, Section 601 fails to define the offense sufficiently

15   to provide notice to the average child of what conduct is prohibited or to provide

16   sufficient guidance to those charged with its enforcement, authorizing and

17   encouraging arbitrary and discriminatory enforcement.

18   205.   Defendants' policies, practices, and customs violate Plaintiffs' rights

19   under the California Constitution and cause serious, irreparable, and lasting harm to

20   these children, which they will continue to suffer in the absence of relief.

21   206.   The mission of Sigma Beta Xi is also frustrated by Defendants'

22   policies, practices, and customs, and Sigma Beta Xi continues to divert resources as

23   a result.

24
25
26
27
28

# ELEVENTH CLAIM FOR RELIEF

**Violation of California Government Code § 11135**
**(The YAT probation program has a significantly adverse impact on Black and Latinx children)**
**(Plaintiffs Andrew M., Sigma Beta Xi, and J.F. against All Defendants)**

207.   Plaintiffs incorporate herein by reference the allegations of Paragraphs 1 through 140 as though fully set forth herein.

208.   This claim is brought by Plaintiffs Andrew M. and Sigma Beta Xi on behalf of themselves and by Plaintiff J.F. on behalf of herself and the members of the proposed class.

209.   California Government Code section 11135 prohibits discrimination "under any program or activity that . . . receives any financial assistance from the state."

210.   Defendants' operation of the YAT probation program has a significantly adverse and disproportionate impact on Black and Latinx children, including Plaintiffs Andrew M. and J.F. and the mentees of Plaintiff Sigma Beta Xi.

211.   Defendants use a risk assessment instrument that results in Black and Latinx children being scored as having a higher risk of future criminality, an undefined concept, based upon broadly drafted questions that invite bias, and perpetuate disparities and discrimination occurring elsewhere in the criminal system and in school discipline. Black and Latinx children are scored as having higher risk than similarly situated white children under Defendants' formula.

212.   Defendants' policy, practice, and custom of placing children on YAT probation contracts has an additional adverse and disparate impact on Black and Latinx children. Even among children who score as having no risk, Black and Latinx children are more likely than white children to be placed on YAT program contracts.

213.   Defendants' policies, practices, and customs violate Plaintiffs' rights under California Government Code section 11135 and cause serious, irreparable,

1  and lasting harm to these children, which they will continue to suffer in the absence

2  of relief.

3      214.   The mission of Sigma Beta Xi is also frustrated by Defendants'

4  policies, practices, and customs, and Sigma Beta Xi continues to divert resources as

5  a result.

### **PRAYER FOR RELIEF**

7      **WHEREFORE**, Plaintiffs respectfully request that the Court:

8  I.      Assume jurisdiction of this matter;

9  II.     Certify a class under Fed. R. Civ. P. 23 (or other analogous procedures)

10         as described above, pursuant to the forthcoming motion for class

11         certification;

12  III.    Appoint the individual Plaintiffs as Class Representatives;

13  IV.     Appoint Plaintiffs' counsel as Class Counsel;

14  V.      Issue a declaratory judgment that:

15         A.   California Welfare & Institutions Code section 601(b)'s

16              prohibition of "persistent or habitual refusal to obey the

17              reasonable and proper orders or directions of school authorities"

18              is unconstitutionally vague;

19         B.   Defendants' application of California Welfare & Institutions

20              Code section 601 through the policies, practices, and customs of

21              YAT is unconstitutionally vague;

22         C.   Defendants' policy, practice, and custom of placing children in

23              the YAT program under the circumstances described above,

24              without adequate notice of (a) the charges against them or the

25              underlying facts supporting the allegation, (b) their legal rights,

26              including the right to consult with counsel, or (c) the possible

27              consequences, and (d) under conditions that are coercive,

28

misleading, and otherwise do not permit voluntary, knowing, and intelligent consent violates Plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution;

D.    Defendants' policy, practice, and custom of searching the homes, belongings, and persons of children placed on YAT probation, including through drug testing, under the circumstances described above, violates Plaintiffs' rights to be free from unreasonable searches under the Fourth Amendment of the U.S. Constitution and Article I, section 13 of the California Constitution;

E.    Defendants' policy, practice, and custom of prohibiting children placed on YAT probation from associating with anyone not approved of by Defendants is overbroad and violates Plaintiffs' rights under the First and Fourteenth Amendment of the U.S. Constitution, and violates Plaintiffs right to freedom of expressive association protected by the First Amendment of the U.S. Constitution; and

F.    Defendants' policy, practice, and custom of operating the YAT probation program, including through utilizing its Risk Assessment Form and the placement of children on YAT probation, has a significant adverse impact on Black and Latinx children in violation of California Government Code section 11135;

VI.    Issue an Order for injunctive relief enjoining Defendant from:

A.    Enforcing California Welfare & Institutions Code section 601(b)'s prohibition of "persistent or habitual refusal to obey the reasonable and proper orders or directions of school authorities";

B.    Continuing their policy, practice, and custom of applying California Welfare & Institutions Code section 601 in an unconstitutionally vague manner including through its referral criteria and in placing children on YAT probation contracts;

C.    Placing children on informal probation contracts, as described above, or any other form of supervision by Defendant without due process of law, including, but not limited to:

1.    Notice containing, at a minimum: (a) an explanation of the charges against a child and the specific conduct alleged to violate the law; (b) an explanation of the juvenile court process and of YAT probation sufficient for a child to make an informed decision regarding participation in YAT probation; (c) a statement of the child's rights, including the right to consult with an attorney, the right to be free from unreasonable searches, and the right to freedom of association; and (d) a statement of the consequences a court would be authorized to issue based on the specific facts of the offense, and all the consequences resulting from YAT;

2.    Access to an attorney who can advise a child in deciding whether accepting YAT probation is in their best interest;

D.    Searching the homes, property, or persons of children placed on YAT probation on the basis of an informal probation contract, as

1   described above, and without a warrant or a specific exception

2   under the Fourth Amendment;

3   E.    Prohibiting children placed on YAT from associating with others

4   "not approved of" by Defendants or others;

5   F.    Continuing to maintain or make use of any records generated

6   through referral and placement of Named Plaintiffs and class

7   members on YAT probation; and

8   G.    Operating the YAT probation program in a manner that has a

9   significant adverse impact on Black and Latinx children,

10  including but not limited to, the use of the Risk assessment form;

11  VII.  Award Plaintiffs Andrew M., Jacob T., and J.F. nominal damages in

12  the amount of one dollar each for violations by Defendants of their

13  constitutional rights;

14  VIII. Award Plaintiffs' costs and attorneys' fees pursuant to 42 U.S.C. §

15  1988; and

16  IX.   Grant such equitable, further, and different relief as the Court deems

17  just and proper.

18  X.    The declaratory and injunctive relief requested in this action is sought

19  against each Defendant; against each Defendant's officers, employees,

20  and agents; and against all persons acting in active concert or

21  participation with any Defendant, or under any Defendant's

22  supervision, direction, or control.

23  Dated:  July 1, 2018          Respectfully submitted,

24

25                               /s/ Sylvia Torres-Guillén

26                               Sylvia Torres-Guillén
                                 ACLU FOUNDATION OF SOUTHERN
27                               CALIFORNIA
                                 Hannah Comstock
28

SMRH:227737035.1

COMPLAINT

1   Victor Leung
    Alexis Piazza

2   ACLU FOUNDATION OF NORTHERN
3   CALIFORNIA
    Christine P. Sun
4   Linnea L. Nelson

5   AMERICAN CIVIL LIBERTIES UNION
    FOUNDATION
6   Sarah Hinger*

7   ACLU FOUNDATION OF SAN DIEGO AND
    IMPERIAL COUNTIES
8   David Loy
    Melissa Deleon

9   SHEPPARD, MULLIN, RICHTER
    & HAMPTON LLP
10  Moe Keshavarzi
    Andrea N. Feathers
11
    NATIONAL CENTER FOR YOUTH LAW
12  Michael Harris

13  Attorneys for Plaintiffs

14  *Pro Hac Vice Motion to be submitted

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SMRH:227737035.1

COMPLAINT